**In re CAMBRIDGE BIOTECH CORPORATION, Debtor.**

**INSTITUT PASTEUR and Genetic Systems Corporation, Appellants,**

**v.**

**CAMBRIDGE BIOTECH CORPORATION, Appellee.**

**Bankruptcy Nos. 95–40188–NMG, 95–40189–NMG and 96–40025–NMG.**
**No. 94–43054–JFQ.**
**Adversary No. 95–04074.**

United States District Court,
D. Massachusetts.

Aug. 15, 1997.

Jeffrey L. Jonas, James E. McGuire, Brown, Rudnick, Freed & Gesmer, Boston, MA, Joseph F. Ryan, Lyne, Woodworth & Evarts, Boston, MA, for Cambridge Biotech Corp. in No. 95–40188.

Jeffrey D. Sternklar, Michael R. Gottfried, Burns & Levinson, Boston, MA, for Institut Pasteur, Genetic Systems Corp. in Nos. 95–40188, 95–40189.

Jeffrey L. Jonas, James E. McGuire, Anthony L. Gray, Brown, Rudnick, Freed & Gesmer, Boston, MA, William J.T. Brown, Donovan, Leisure, Newton & Irvine, New York City, Joseph F. Ryan, Lyne, Wood-

worth & Evarts, Boston, MA, for Cambridge Biotech Corp. in Nos. 95–40189, 96–40025.

Richard S. Gresalfi, Paul H. Heller, Kenyon & Kenyon, New York City, Jeffrey D. Sternklar, Michael R. Gottfried, Burns & Levinson, Boston, MA, for Institut Pasteur, Genetic Systems Corp. in No. 96–40025.

## MEMORANDUM AND ORDER

GORTON, District Judge.

These appeals involve three patents owned by Institut Pasteur: Patent Nos. 5,055,391 ("'391 patent"), 5,051,496 ("'496 patent") and 5,217,861 ("'861 patent"). In Appeal Nos. 95–CV–40189 and 96–CV–40025, Institut Pasteur ("IP") and Genetic Systems Corporation ("Genetic"), collectively referred to as "Pasteur," appeal from 1) an Order of the United States Bankruptcy Court granting summary judgment against Pasteur on Counts 2 and 3 (Patents '391 and '496) and 2) that same court's determination that a) Pasteur is entitled to damages of only 1% for defendant's infringement of its '861 patent and b) a third party (Pasteur Sanofi Diagnostics, "PSD") is not an indispensable party to the Claim (Count 1) related to that patent.

In Appeal No. 95–CV–40188, defendant/appellee, Cambridge Biotech Corporation ("CBC") appeals from the allowance by the Bankruptcy Court in the same order of Pasteur's motion for summary judgment against CBC on Count 1 for infringement of the '861 Patent. This Court has jurisdiction over the appeals pursuant to 28 U.S.C. § 158(a).

## I. *Factual and Procedural Background*

### A. *The Parties*

On July 7, 1994, CBC, a biotechnology company with facilities in Worcester, Massachusetts and Rockville, Maryland, filed a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code. IP, a French foundation, had previously discovered and was granted certain patents related to the HIV virus. Three of those patents are subjects of these appeals. Genetic, originally an independent, U.S. corporation, has been authorized to exploit certain patent

rights of IP since 1984 and was acquired by PSD, which is owned in part by IP, in 1990.

### B. *The Relevant Agreements and Licenses*

#### 1. *The IP/PSD Agreement*

On March 26, 1981, IP granted to PSD (its subsidiary) a right of first refusal to use all of IP's existing and future patents, know-how, processes and models in the diagnostics field. In 1986, the same two parties entered into an agreement specifically covering the HIV technology. In 1990 that agreement was superseded by one which requires payment by PSD to IP of an annual research contribution of approximately $2 million, a minimum royalty of approximately $3.5 million, a 6% royalty on sales made by PSD and Genetic (IP's exclusive U.S. licensee) of the licensed technology and 50% of all royalties received from other sublicensees. Pursuant to that agreement, IP has licensed the '861 Patent (among others) to PSD and Genetic.

#### 2. *The 1984 BVD Agreement*

In November, 1984, PSD and Genetic entered into an agreement ("the 1984 BVD Agreement") approved by IP, whereby PSD and Genetic entered into a joint venture and formed a corporate entity known as Blood Virus Diagnostics, Inc. ("BVD"). By virtue of that agreement, PSD licensed to BVD, on a world-wide exclusive basis, the intellectual property rights it had obtained from IP, and Genetic, in turn, licensed to BVD its diagnostic testing technology, on a world-wide exclusive basis, and invested $1 million up front in BVD. In addition, Genetic committed to spending at least $3.5 million on HIV research over the following three and one-half years. BVD itself then granted to Genetic exclusive rights to exploit the pooled technology in the United States (and certain other countries) and to PSD the rights to exploit such technology elsewhere throughout the world. Both licenses included the right to sublicense, subject to the terms of the basic agreement between IP and PSD.

#### 3. *The 1987 Settlement Agreement*

In 1987, the then leaders of HIV technology: IP, the United States Department of Health and Human Services ("HHS") and the National Technical Information Service ("NTIS"), entered into an agreement (the "Settlement Agreement") in an effort to make HIV technology more widely available. Under the terms of the Settlement Agreement, the patent rights of the parties, including improvement technology, are to be made available to all of their respective licensees. IP's '861 patent was a continuation of a patent listed in the Settlement Agreement as improvement technology and, therefore, was subject to the provision of that Agreement that made it available to all licensees of each party "at a royalty rate and under conditions no less favorable than those offered [to IP's] own licensees." *See* Settlement Agreement at p. 17.

CBC has a license with NTIS under which it pays NTIS a 5% royalty for the use of certain HIV–1 technology and 6% on other HIV–1 technology. As a licensee of NTIS, CBC is entitled to a license on the '861 Patent as improvement technology.

#### 4. *The Cross–Licenses Between PSD and CBC*

In October, 1989, PSD entered into certain cross-license agreements with CBC. The interpretation of one of those cross-licenses is at issue in Appeal No. 95–40189 and will be discussed more fully *infra.*

### C. *CBC's Plan of Reorganization*

Pursuant to separate appeals, this Court confirmed the Plan of Reorganization ordered by Bankruptcy Judge Queenan and that confirmation was subsequently affirmed by the First Circuit Court of Appeals.

### D. *The Relationship Between Pasteur and bioMérieux*

As a result of the Plan of Reorganization, CBC sold its stock to bioMérieux Vitek, a subsidiary of bioMérieux S.A. The parent corporation is a large, French biotechnology corporation with sales of nearly $500 million in 1995 and a significant market share in the infectious disease diagnostic market outside of the United States.

PSD has previously granted to bioMérieux S.A. a worldwide license (except in the United States and several other countries) to test

for HIV Type 2, but only as part of a specific, limited system used by bioMérieux. Thus the license is limited both in territory and application. In consideration for that license, bioMérieux S.A. paid IP a lump sum of 3,250,000 French francs (approximately $650,000) and agreed to pay a 15% royalty on net sales.

### E. PSD's Licensing Practices

As a normal business practice, PSD acquires rights to technology owned by its licensees in consideration for and as part of any license it grants for use of its HIV-2 patents. The extent of the technology it receives and the royalties it pays for the exchange of technology depends upon the scope of the HIV-2 license it negotiates in good faith and at arms length. On occasion, the HIV-2 licenses that PSD grants are limited in scope, both in the applications to which the patented technology may be practiced and in territory, and license terms may also depend upon the size and relative competitive advantage of the prospective licensee. PSD, therefore, attaches great significance to bioMérieux, S.A.'s obtaining of a license to sell HIV-2 products through its acquisition of CBC which was accomplished through CBC's Plan of Reorganization earlier in these bankruptcy proceedings.

## II. Standard of Review

The Bankruptcy Court's findings of fact are reviewed under the "clearly erroneous" standard and its conclusions of law are reviewed de novo. Fed.R.Bankr.P. 8013; In re Winthrop Old Farm Nurseries, Inc., 50 F.3d 72, 73 (1st Cir.1995).

## III. Separate Appeals

### A. Appeal 95-40188-NMG

In Appeal No. 95-40188, CBC appeals from Bankruptcy Judge Queenan's Order granting summary judgment in favor of the appellee Pasteur for infringement of IP's '861 Patent. IP is the owner and Genetic the exclusive United States licensee of that patent.

While researching AIDS, Professor Montagnier of IP discovered, among other things, several proteins in HIV-1 which are "antigenic," including the protein known as p18. That protein and its use is the subject matter of the claims of the '861 patent at issue. "Antigenic" proteins ("antigens") like p18 are proteins that cause an immune response in the body, i.e. cause antibodies to be produced. If infected with HIV-1, an individual is likely to develop antibodies to some or all of the antigens in the virus. Because that is so, the presence of p18 is an indicator that an individual is HIV-1 positive.

Judge Queenan found that CBC infringed Claims 1-4 of the '861 patent which teach methods of how to use p18 and the characteristics of the product itself.

### 1. Discussion

■ CBC argues that the Bankruptcy Court misinterpreted the '861 patent method claims (1-3) and did not consider relevant file history. CBC asserts that the Bankruptcy Court erred when it, in effect, enlarged the claims of the patent by stating that "the absence of p18, *together with the absence of the other antibodies discussed above,* is indicative the individual does not have *HIV-1* or AIDS." 186 B.R. at 21 (emphasis added). Moreover, CBC claims that by including the term "HIV-1" with the term "AIDS" the Bankruptcy Court further broadened the claim.

According to CSC, scientific evidence shows that p18's presence or absence, without more, is not an indicator of HIV. The Bankruptcy Court's alleged enlargements of the patent, therefore, significantly affect whether CBC's use of p18 (which CBC refers to as p17 in its products) infringes the '861 patent. CBC contends that the '861 patent teaches the use of *isolated* p18 as an in vitro diagnostic method that is indicative of AIDS only and that, as such, CBC's Western Blot Kits do not infringe the claimed invention. Moreover, CBC asserts that there exist genuine issues of material fact as to the validity of the patent claims, including questions of whether the product claim is obvious and/or

anticipated by the prior art.[1]

Pasteur responds that 1) the file history, including the prior art, was before the Bankruptcy Court and was specifically discussed at oral argument, 2) CBC improperly focuses on the '861 patent's preamble rather than the claims themselves, and 3) the preamble is not a limitation because it is not essential to teach the invention.

### 2. Court's Conclusion

Both parties moved for summary judgment on Count 1 of IP's claim of infringement of the '861 patent. It is apparent, therefore, that, at least at that time, both parties believed there was no genuine issue of material fact on the infringement issue. Furthermore, CBC does not contest fact issues. Instead, it contests: 1) the Bankruptcy Court's claim interpretation which is a conclusion of law by a court made prior to submitting any issue of infringement to a jury (see *Markman v. Westview Instr. Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd* — U.S. —, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)); 2) obviousness, i.e. patent validity, which, despite its factual underpinnings, is also a question of law; and 3) whether the Bankruptcy Court correctly disallowed CBC's anticipation defense which is a discretionary decision of the Court. Hence, this Court agrees with the parties (and with the Bankruptcy Court) that there is no genuine issue of material fact with respect to Count I.

We are left, therefore, with the *de novo* review of the Bankruptcy Court's conclusions of law. Having done such a review aided by the extensive written submissions of the parties, this Court concludes that the Bankruptcy Court correctly interpreted the claims in the '861 patent and determined its validity. *See* 35 U.S.C. § 282 (stating that a patent is presumed valid and the burden of establishing invalidity rests on the party asserting it). Specifically, claims 1 through 4 of the '861 patent, as properly interpreted, "read on" CBC's kit, and its use, the '861 patent is not invalid for obviousness or based upon the prior art and the absence of p18, found through the methods claimed, is indicative that an individual does not have HIV-1 or AIDS. Moreover, this Court agrees with Pasteur's argument that the language of the '861 patent claims do not preclude additional steps with other proteins and may even contemplate that other proteins would be employed in the claimed diagnostic method.

The Bankruptcy Court's conclusions of law and its Order with respect to the infringement of the '861 patent will, therefore, be affirmed and CBC's appeal therefrom will be dismissed.

### B. Appeal 95–40189–NMG

In Appeal 95–40189 Pasteur appeals Bankruptcy Judge Queenan's allowance of summary judgment in favor of CBC on Pasteur's claims of patent infringement of the '391 and '496 Patents. With respect to those claims, the Bankruptcy Court ruled that equity requires treating Pasteur as if it had granted licenses to CBC for the use of the two patents at issue and thus the Court found no infringement. It also found that PSD was not an indispensable party to counts 1 and 2 of CBC's counterclaim and, therefore, denied Pasteur's motion to dismiss those counts on that ground.

### 1. Factual Background

The issue in this appeal involves the interpretation of a cross license agreement between CBC and PSD. IP is a part owner of PSD, owns the patents at issue and granted PSD an exclusive license to use those patents for commercial purposes. PSD, in turn, licensed its rights to use those patents in the United States (and in a few other countries) to Genetic through the BVD Agreement. IP

---

1. CBC also asserts that the Bankruptcy Court erred in dismissing CBC's anticipation defense because, although CBC did not originally plead it, Pasteur had notice of the defense by virtue of CBC's pleading an obviousness defense, i.e. anticipation is part of obviousness. Pasteur was not prejudiced by the late-claimed defense, argues CBC, because it knew of the anticipation defense 26 days before the scheduled trial and had time to prepare an affidavit and take depositions in opposition to it. Pasteur responds that the defense of anticipation is not available to CBC because it is an affirmative defense that was waived because it was not raised in the original pleadings.

and Genetic sued CBC for patent infringement in the Bankruptcy Court but PSD was not joined as a party plaintiff even though it is a party to the cross-license in question.

Pasteur asserts that the intent of the parties to the cross-license, PSD and CBC, is a central, and therefore genuine, issue of fact and as such precludes the imposition of summary judgment on those counts. The particular clause in question is the Recovery of Rights Clause. At the time of the negotiation of the cross-license, PSD was also in the process of trying to recover from Genetic the right to sell products related to IP's patents in the United States. According to Pasteur, the plan was to renegotiate the agreement between Genetic and PSD so that both companies would have rights to sell their respective HIV products worldwide and neither company would have to give any financial consideration for the exchange. Ultimately, PSD was able to recover only the rights to sell its IP patent-related products in South Africa. According to Pasteur, Genetic was constrained by its limited partners from releasing any other rights.

During the protracted negotiations between PSD and Genetic, Bristol–Myers purchased Genetic and negotiations between PSD and Genetic came to a halt "temporarily". At that same time, the cross-license between CBC and PSD was signed through which the parties exchanged rights to sell and use their respective technology. CBC was to pay a 6% royalty to PSD and PSD agreed to use its "best efforts" to recover the rights it had previously limited to Genetic (through the BVD Agreement) so that they could be passed on to CBC through the cross-license. Negotiations between PSD and Genetic were, however, never seriously resumed and PSD has not, to this day, recovered those rights.

PSD's failure to recover the rights in question is further complicated by the fact that Genetic was subsequently acquired from Bristol–Myers by Elf Sanofi, Inc. which, in turn, transferred ownership of Genetic to a company called Kallestad, since renamed Sanofi Diagnostics Pasteur, a wholly owned subsidiary of PSD. PSD informed CBC of Kallestad's new ownership of Genetic and CBC claims it understood that information to mean that PSD had, by use of its best efforts, recovered the rights previously owned by Genetic. CBC began selling HIV–2 products using the '391 and '496 Patents and, pursuant to the cross-license, sent royalty checks to PSD. Pasteur contends that the royalty checks were not paid until 18 months after the acquisition of Genetic and that, upon receipt of those checks from CBC, PSD attempted to return them and informed CBC that PSD did not own the rights in those patents.

### 2. The Bankruptcy Court's Decision

The Bankruptcy Court found that, although PSD had not recovered the rights surrounding the '391 and '496 Patents, equity required treating as done that which should have been done. That Court concluded that because Genetic was a wholly owned subsidiary of a company (Kallestad) that was wholly owned by PSD, it would have required only minimal efforts for PSD to recover the rights at issue here. Although PSD did not acquire and still does not own those rights, the Bankruptcy Court found, in essence, that CBC holds a license to them and that Genetic and IP therefore do not have a cause of action for infringement of those same rights. The Court conceded, however, that Genetic may have a cause of action against PSD for breach of contract.

### 3. Genuine Issue of Material Fact

The question of whether a contract is unambiguous is a question of law and thus subject to de novo review. In re Navigation Technology Corp., 880 F.2d 1491, 1495 (1st Cir.1989); NASCO, Inc. v. Public Storage, Inc., 29 F.3d 28, 32 (1st Cir.1994) (quoting FDIC v. Singh, 977 F.2d 18, 22 (1st Cir. 1992), interpreting Massachusetts law); Salmon v. Laser Plot, Inc., 189 B.R. 559, 561 (D.Mass.1995). If a contract is deemed ambiguous, deciding the intention of the parties is a question of fact and is thus reviewed under a clearly erroneous standard. Id.; c.f. KangaROOS U.S.A., Inc. v. Caldor, Inc., 778 F.2d 1571, 1577 (Fed.Cir.1985) (stating that a party's intent to a contract is not often amenable to summary resolution). Finally, if a

contract is deemed unambiguous, interpreting the written provisions of that contract is a question of law and thus subject to a *de novo* review standard. *See Allstate Ins. Co. v. Bearce*, 412 Mass. 442, 446–47, 589 N.E.2d 1235 (1992).

### a. *Discussion*

Pasteur asserts that there is a genuine issue of material fact with respect to the intent of the parties to the cross-license. It contends that the "best efforts" clause did not require PSD to pursue the recovery of the HIV–2 license rights after the acquisition of Genetic by Elf Sanofi, Inc. and that such efforts were intended to be limited to the then ongoing renegotiation of the "BVD Agreement" between Genetic and PSD that governed those rights. In support of their contention, Pasteur cites the part of the "best efforts" clause (Section 2.2) which states that PSD will inform CBC about the "progress and results *of such discussions*" (emphasis added).

Pasteur protests that:

1) if the best efforts requirement was not limited to the then ongoing discussions, there would be no limit at all and PSD would have to pursue the rights at issue *ad infinitum;*

2) the ultimate acquisition of Genetic by a subsidiary of PSD does not change the initial intention of the parties to the contract; and

3) the only way PSD could have acquired the rights currently owned by Genetic would have been to ignore the separate corporate entities, treat Genetic's property as Pasteur's property, and force Genetic and its directors to act against their self interest, despite the fact that the "properties of two corporations are distinct. . . ." C. Keating et al., 1 *Fletcher Cyclopedia of the Law of Private Corporations* § 31 at 556 (1990).

CBC responds that a "best efforts" provision clearly requires the burdened party to put forth a concerted effort to perform the relevant expressed promise and to take action reasonably implied from it and that a failure to do so constitutes a breach of such provision. CBC also points out that the

rights to use the technology in South Africa had already been recovered prior to the execution of the cross-license between PSD and CBC and that PSD's negotiations with Genetic, which had stalled prior to the signing of the cross-license, never resumed after the cross-license became effective.

### b. *Conclusion*

This Court reviews *de novo* the Bankruptcy Court's finding that there is no genuine issue of material fact. There is obviously a dispute with respect to the meaning and intent of the "best efforts" clause in the cross-license, but apparently there is no dispute that PSD did nothing after the execution of the cross-license to recover the rights from Genetic. Although there is surely room to argue about what efforts should have been taken, it is abundantly clear that PSD's "best efforts" required it to make at least some effort. To that extent, therefore, the cross-license is unambiguous and this Court concludes that PSD breached the cross-license by making insufficient effort to recover the relevant rights from Genetic.

To the extent that the requirements of the "best efforts" clause of the cross-license are ambiguous, this Court finds that the Bankruptcy Court's interpretation thereof is not clearly erroneous. Although this Court does not ignore the identity of the several corporate entities involved in this case in which 1) PSD is the parent corporation of Genetic's parent, 2) PSD breached a contract the compliance which would have materially affected Genetic, and 3) CBC has no remedy at law, this Court finds the Bankruptcy Court's application of equitable principles was particularly appropriate under the circumstances.

The Bankruptcy Court's finding that no genuine issue of material fact exists and its conclusion that CBC is entitled to summary judgment on Pasteur's claim of infringement of the '391 and '496 Patents are sound and well reasoned and will be affirmed.

### 4. *Failure to Join an Indispensable Party*

CBC contends, in Counts I and II of its counterclaim, that PSD breached its cross-

license by failing to recover the rights related to the '391 and '496 Patents and for that reason CBC cannot be held liable for infringement of those patents. Pasteur responds that PSD is an indispensable party to CBC's counterclaim and, because PSD is not and cannot be joined as a party thereto, that counterclaim must be dismissed.

### a. Discussion

Pasteur argues that 1) because PSD was a signatory of the cross-license at issue, it is clearly a party that should be joined if feasible in accordance with Fed.R.Civ.P. 19(a) and 2) by finding that PSD breached the cross-license without requiring its joinder as a party to the suit, the Bankruptcy Court violated PSD's due process rights. PSD cannot, however, be joined because it is not subject to service of process in this district and venue is improper. Specifically, PSD is a corporation organized under the laws of France and the forum selection clause of the cross-license itself requires that suits against PSD be brought in that country.

Pasteur further contends that the Bankruptcy Court erroneously applied the four factor test enumerated in Fed.R.Civ.P. 19(b) for the reasons stated above and because:

1) POD could not be adequately represented by Genetic and IP;

2) Genetic was deprived of a property right without due process; and

3) CBC has an adequate remedy against PSD in France pursuant to the cross-license.

Pasteur notes that CBC had been aware of the dispute regarding the cross-license since 1991 when PSD advised CBC that the patents at issue were not part of their agreement.

### b. Conclusion

Because PSD is a party to the cross-license, this Court concludes that it is a necessary party. However, if CBC is foreclosed from to arguing the breach of contract as a defense to its alleged infringement of the '391 and '496 Patents, it is left with no defense at all.

Where, as in this case, it is not feasible to join a party necessary to the action, a court must determine if, in equity and good conscience, the action should proceed without that party through the application of the four factors listed in Fed.R.Civ.P. 19(b):

1) the extent to which judgment rendered in the party's absence might be prejudicial to that party or those already parties;

2) the extent to which the court could lessen or avoid the prejudice by entering protective provisions or shaping the relief accordingly;

3) whether a judgment rendered in the party's absence will be adequate; and

4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

This Court applies those factors to the facts of this case as follows:

1) PSD's absence is prejudicial to it, although the presence of closely related entities with interests that coincide with PSD's reduces that prejudice.

2) There is no way to impose judgment so as to avoid or lessen the prejudice to PSD, although it will be allowed to join in this action of its own volition.

3 & 4) Although a judgment entered in PSD's absence will not be completely adequate, CBC will be more severely prejudiced if it is foreclosed from arguing its only defense to Pasteur's allegations of patent infringement.

IP and Genetic brought the adversary proceeding that is under appeal and are the only entities necessary to it because Genetic owns the relevant patent rights and IP owns the relevant patents. It is true, however, that the patent rights held by Genetic are based solely upon its contract with PSD, a contract possibly in dispute by virtue of PSD's alleged duty to recover those rights under its cross-license with CBC. PSD is a corporation related by ownership with both IP and Genetic and could easily have joined the adversary proceeding below to prevent any misunderstanding with respect to the intent and meaning of the contracts at issue. Furthermore, Pasteur has a firm grasp on POD's contractual allegations and has argued them. Although plaintiffs have the right to commence proceedings as they see fit, it would

be unjust and unfair to allow a party to avoid jurisdiction while it is, in essence, represented by a closely related entity having coincidental interests.

Although this Court concludes that PSD is a necessary party to this action, it concurs with the Bankruptcy Court that PSD is not an indispensable party because, based upon principals of "equity and good conscience the action should proceed" without PSD. Fed. R.Civ.P. 19(b).

The Bankruptcy Court's conclusions that, with respect to the adversary proceeding under appeal, 1) no genuine issue of material fact exists, 2) PSD is not an indispensable party, and 3) CBC is entitled to summary judgment on the issue of infringement of the '391 and '496 Patents are sound and well reasoned and will be affirmed.

### C. *Appeal No. 96–40025–NMG*

In November, 1995, the Bankruptcy Court conducted a bench trial to determine damages for the infringement of the '861 Patent by CBC. Subsequently, the Bankruptcy Court entered a judgment dated January 5, 1996 (amended on February 12, 1996) awarding damages of $29,601.17 to Pasteur for patent infringement from July 7, 1994 to September 11, 1995 and one percent (1%) of CBC's sales of its Western Blot Kits from September 11, 1995 to December 31, 1995. The monetary award represented 1% of CBC's sales of approximately $3 million of Western Blot Kits during the subject time frame. The Bankruptcy Court also declared a worldwide license of the '861 Patent to be in effect as of January 1, 1996 in favor of CBC at a royalty rate of 1%.

The findings of the Bankruptcy Court were based upon its determination that 1) the Settlement Agreement entitles licensees of HHS and NTIS (including CBC) to the same license terms for IP's "improvement technology" as had previously been granted to Genetic and 2) Genetic pays a one percent (1%) royalty for IP's "improvement technology." Section VI.B.2 of the Settlement Agreement provides:

Improvement Technology made available ... by one Party to the licensees of the other Party shall be made available by the licensor at a royalty rate and under conditions no less favorable than those offered to its own licensees.

The 1984 BVD Agreement had been signed three years before the Settlement Agreement was negotiated. Genetic, as a party whose rights would be affected, therefore, was required to and did consent to the Settlement Agreement.

### 1. *Discussion*

Generally, Pasteur argues that the Bankruptcy Court's decision on damages is clearly erroneous, contrary to the intentions of the parties to the "Settlement Agreement" and flawed because that Court improperly equated non-comparable license agreements. Pasteur therefore requests that the order of damages be vacated and that its right to a jury trial be restored.

> Specifically, Pasteur contends that it would make no sense to read into the subject section of the Settlement Agreement, the pre-settlement contract which granted an exclusive license to PSD and through PSD to Genetic at a fixed royalty. Furthermore, because IP had licensed all of its HIV technology to PSD and through PSD to Genetic, Pasteur asserts that the Bankruptcy Court's interpretation of the Settlement Agreement, as indicating that Genetic was a licenses of IP, would render superfluous the provision relating to technology "not yet licensed" to *any* licensees. *See* Settlement Agreement at p. 18.[2]

Moreover, Pasteur argues that even if the Bankruptcy Court's treatment of Genetic as a licenses under the Settlement Agreement is correct, the award of a royalty of one percent (1%) is woefully inadequate. One percent (1%) was arrived at by subtracting from the six percent (6%) royalty that Genetic pays IP, the five percent (5%) royalty paid for the existing technology under the Settlement

---

**2.** Although the Bankruptcy Court's interpretation may render superfluous this particular provision with respect to IP, the provision is not superflu-
ous to the other parties to the Settlement Agreement.

Agreement. This analysis, in Pasteur's opinion, ignores

1) the fact that Genetic contributed to the BVD Agreement up front money in 1984, promised and performed research efforts for HIV testing, and granted to IP the right to use Genetic's own inventions, know-how and discoveries;

2) the 1990 agreement under which Genetic agreed to pay $2 million annually for research and a minimum of $3.5 million in royalties; and

3) other contracts which contradict the logic of the Bankruptcy Court's finding of a One Percent (1%) royalty.

Pasteur particularly contests the Bankruptcy Court's declaration of a license between IP and CBC encompassing the '861 patent, on the grounds that 1) such a declaration is not only contrary to the terms of the Settlement Agreement but also contrary to the interpretation of that agreement by the parties to it as shown by Genetic's continued use and sublicensing of the exclusive rights at issue before and after the Settlement Agreement and 2) the Bankruptcy Court previously recognized that Genetic is Pasteur's licensee with exclusive rights to lease in the United States and elsewhere.

In contrast to the Bankruptcy Court's award of damages at a rate of 1%, Pasteur suggests that a rate greater than 15%, plus an up front payment of more than $500,000, would be appropriate. Pursuant to 35 U.S.C. § 284, infringed patentees are entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." A reasonable royalty can be based upon a hypothetical negotiation at the time the infringement began. *Unisplay v. American Electronic Sign Co.*, 69 F.3d 512, 517 (Fed.Cir.1995). According to Pasteur, a hypothetical negotiation in 1993 would have resulted in the granting of a license at 15%, plus an up front payment of $500,000.

CBC responds that, because it was and is entitled to a license to use the '861 Patent technology under the Settlement Agreement, it would be inequitable to impose damages or require royalty payments of anything greater than 1% of the sales of the infringing products. Furthermore, Pasteur's hypothetical royalty rate is inappropriate because, as improvement technology, the '861 patent is useful only as an add-on to existing, core technology and it is, therefore, illogical to assert that the '861 patent technology is worth more than that charged for the prior existing technology, i.e. 5%.

### 2. *Conclusion*

 The determination by the Bankruptcy Court of damages, i.e. a reasonable royalty rate, is reviewed by this Court under a clearly erroneous standard. Pasteur bears the burden of proving damages and, although it may offer proof of damages greater than a reasonable royalty rate, the ultimate determination is left to the trial court's discretion. *See Paper Converting Machine Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 21 (Fed.Cir. 1984).

This Court has carefully considered the Settlement Agreement and the arguments of the parties and it can find no compelling reason to interpret the agreement other than as did the Bankruptcy Court. The Settlement Agreement specifically lists Genetic and PSD as "licensees" and suggests the amount licensees of each party are to be charged for improvement technology. It makes no exception for the relationship between Genetic and IP or PSD and IP. It is clear that IP, in particular, and Genetic and PSD, as effected parties, were in the best position to define the terms of the Settlement Agreement when it was drafted. The burden was on the parties to the contract to make their relationship clear and, particularly, to distinguish Genetic and PSD from other licensees if that was their intention.

The Settlement Agreement does, however, speak to more than just an equivalent royalty rate when it states that improvement technology should be available "at a royalty rate *and under conditions* no less favorable...." Settlement Agreement at p. 17 (emphasis added). Such conditions could, in fact, include comparable up front payments, guaranteed minimum royalty payments and free exchanges of technology as Pasteur suggests.

Yet the Bankruptcy court's interpretation of the emphasized phrase as it applies to the appropriate royalty rate for the '861 patent, i.e. that the additional consideration was paid for the other technology and for the totality of the relationship between Genetic, PSD and IP, is not in this Court's opinion, clearly erroneous. Nor is the Bankruptcy Court's declaration that the license for the '861 Patent is between IP and CBC clearly erroneous. This Court affirms the Bankruptcy Court's award of damages at a One Percent (1%) royalty rate and its related findings in the adversary proceeding that is the subject of Appeal 96–40025 and this appeal will, therefore, be dismissed.

## ORDER

The Bankruptcy Court's decisions which are the subject matter of Appeals Nos. 95–40188, 95–40189, and 96–40025 are hereby affirmed and those appeals are dismissed.

So ordered.