**In re CUMBERLAND FARMS, INC., Debtor.**

No. 92–41305–JFQ.

United States Bankruptcy Court, D. Massachusetts.

June 8, 2000.

---

### DECISION

JAMES F. QUEENAN, Bankruptcy Judge.

The reorganized debtor, Cumberland Farms, Inc. ("Cumberland"), objects to the claims of Demetrios B. Haseotes ("Haseotes") in the stated total amount of "at least" $3,003,452 (plus interest and attorneys' fees) for prepetition indebtedness owed on Cumberland's promissory notes.[1] Cumberland does not dispute its basic liability under the notes, although it does deny any responsibility to pay postpetition interest and attorneys' fees. Cumberland's main objection is based on its own claim of $5,753,179 arising from an alleged breach by Haseotes of his fiduciary duty of loyalty owed Cumberland as a member of its board of directors. Cumberland contends Haseotes was derelict in his loyalty obligation when he caused his wholly-owned corporation to make payments on indebtedness owed to him. It is critical of these payments because this same corporation owed Cumberland a much larger debt, and it was primarily the nonpayment of this debt that brought about Cumberland's chapter 11 filing. Cumberland asserts setoff rights only. It does not seek

---

1. In November of 1992, Haseotes filed two proofs of claim asserting no security or priority, claim No. 4893 in the stated sum of "$12,-206,141.54 at least," and claim No. 4895 in the stated sum of "$780,077 at least." On July 12, 1999, Haseotes amended claim No. 4893 to increase its amount to $2,223,375 plus interest and attorneys' fees, thereby increasing the total claims to "at least" $3,003,-452.

judgment against Haseotes for the excess of its claim over the undisputed portion of the Haseotes claim. I set forth here my findings of fact and conclusions of law following trial.

## I. *FACTS*

Cumberland's business was begun in 1938 by Vasilios and Aphrodite Haseotes, the parents of the present stockholders, when they bought a dairy farm in Cumberland, Rhode Island. Cumberland operates (or leases to third parties) over a thousand convenience stores and gas stations throughout New England, the Mid–Atlantic states and Florida. The gas stations operate under the "Gulf" trademark. It also conducts wholesale operations in beverage, bakery and dairy products, supplying these products to both unaffiliated third parties and its own convenience stores. Cumberland owns and manages real estate for its benefit and the benefit of affiliates. It delivers refined petroleum products to its own gas stations and those of third parties. Its gross income from these operations is well over $1 billion.

Cumberland was incorporated in Delaware, has its executive offices in Canton, Massachusetts, and has elected to be taxed under Subchapter S of the Internal Revenue Code. Its shareholders are all siblings. The voting shares are held 25% each by the claimant Haseotes, Lilly H. Bentas ("Bentas"), George Haseotes and Byron Haseotes. These same individuals own an equal portion of 75% of its nonvoting shares. Bentas and three sisters each own 6.25% of the nonvoting shares. The voting shareholders are members of Cumberland's board of directors.

Cumberland's growth from a dairy farm has been gradual. In 1956 it opened its first "jug milk" store. Realizing the importance of linking retail food and gas station operations, it opened its first gasoline station ten years later under the trademark "Dis–Gas," obtaining some of its petroleum requirements from Chevron U.S.A., Inc. ("Chevron"). On May 31, 1986, Cumberland cemented its association with Chevron by buying Chevron's northeast marketing and distribution assets through the purchase of the following: the right to use the "Gulf" name in eleven states, 503 Chevron gas stations, twenty oil terminals, four deepwater ports, and related equipment. Cumberland also at that time entered into a petroleum supply agreement with Chevron.[2]

In 1986, Haseotes, the oldest of seven brothers and sisters (one sister has died), had been chairman of Cumberland's board and its chief executive officer since 1960. (A nonfamily member served as president.) Haseotes was then the undisputed family leader. In that year, at about the time Cumberland closed on the Chevron purchase, Haseotes became interested in purchasing an oil refinery located in the town of Come–By–Chance. Newfoundland, Canada. The refinery's operations had been dormant for several years. Not having any experience in refining, he sought the advice of one William Gordon, who had recently retired from Sun Oil Company. They inspected the refinery together. Haseotes told Gordon that the information he had gained so far led him to believe an expenditure of $25 million would get the refinery up and running. Gordon said he thought the cost would be closer to $100 million. He also told Haseotes that Sun Oil had lost money in its refinery operations, and he believed Cumberland did not need a refinery because Chevron provided it with an adequate source of refined petroleum products.

Haseotes nevertheless decided to proceed with the purchase. On the advice of counsel, he chose to own the refinery through his own wholly-owned entities

---

**2.** Cumberland's former Gulf oil division is now operated by a limited partnership in which Cumberland holds a 66⅔% ownership interest. Of the remaining 33⅓%, 1% is held by Catamount Petroleum L.P. as managing general partner, and 32.33% is owned by members of the Kaneb family, owners of Catamount Petroleum L.P.

rather than to have Cumberland or a subsidiary take ownership. This was because counsel informed him that a company which both operates a refinery and sells petroleum products at retail can be prohibited from doing business with other retailers in the State of Connecticut. He and the other shareholders agreed to the proposed ownership arrangement. They had an unwritten and vague understanding that all of them (or Cumberland) would somehow benefit from the refinery. But they understood that only Haseotes would have a beneficial interest in the refinery. Although Haseotes testified otherwise, I find there was no discussion about Cumberland or his siblings having an option to purchase an ownership interest.

Haseotes proceeded to acquire the refinery in late 1986 for a consideration described in the evidence as "nominal." Its physical assets were taken in the name of Newfoundland Processing Limited ("NPL"), which was formed to conduct the oil refining operations. NPL was a wholly-owned subsidiary of Newfoundland Energy, Limited ("NEL"), all of whose shares were owned by Haseotes. He was also the 100% owner of Cumberland Crude Processing, Inc. ("CCP"), which was organized to purchase crude oil, have it refined by NPL and sell the refined product to Cumberland. The parties initially intended that Cumberland would purchase all of the refinery's output of automobile gasoline, with the refinery's production of heating oil to be sold in the open market.

Funds began to pour into NPL and CCP to bring the refinery's physical plant up to snuff and to provide it with working capital. Haseotes' initial estimate of a total expenditure of $25 million proved to be very low. Cumberland, through Haseotes, made net advances of over $50 million to CCP and almost another $20 million to NPL. Cumberland's board acquiesced in the loans. CCP advanced some of its loan proceeds to NPL as prepaid processing fees. Cumberland's loans to CCP were eventually represented by CCP's promissory note payable to Cumberland dated as of October 1, 1987 in the principal sum of $52,049,437, payable on demand but no later than December 31, 1989. When this note remained unpaid when due, it was replaced by a new note in the same amount payable on demand but no later than October 10, 1990. The sum of $52,-049,437 represents advances by Cumberland to CCP of $67,015,464 between August 20, 1987 and December 19, 1988, less $16,836,027 of payments, plus (apparently) some interest.

Cumberland's $120 million loan agreement with Industrial Bank of Japan Trust Company ("IBJ"), acting for itself and as agent for a consortium of banks, provided that Cumberland would put no more than $20 million into the refinery entities. In 1988, IBJ learned to its consternation that Cumberland had far exceeded this limit. IBJ required that Haseotes step down as Cumberland's chief executive officer. It also forced Donald E. Holt ("Holt") to resign as Cumberland's chief financial officer.[3] IBJ prohibited Haseotes from keeping a large portion of Cumberland's profit distributions payable to him in 1989 and 1990 as a stockholder of a Subchapter S Corporation. It required Haseotes to loan most of his share of the distributions back to Cumberland in consideration of the notes which form the basis for most of his present claim.[4] Haseotes has thereafter served as an "executive employee" of Cumberland.

3. Holt was thereafter replaced by Arthur G. Koumantzelis, who had been head of the Boston office of Arthur Young, Cumberland's auditor. Holt became vice president of marketing and manufacturing. In 1989 Bentas assumed the position of CEO and president, replacing nonfamily members who were unable to function in the presence of Haseotes.

4. Eight of the nine notes, having a total principal amount of $2,072,752, were executed in 1989 and 1990 in response to IBJ's demand. Cumberland executed the other note in 1986.

Haseotes, Bentas, and other Cumberland stockholders, and affiliated family entities, also advanced funds to CCP. As of January 1, 1992, the balances of these advances were in the following approximate amounts: Haseotes and his wholly-owned entities—$17,500,000; Bay Colony Limited Partnership (whose partners were Cumberland's four voting shareholders)—$5,045,000; Byron Haseotes—$3,350,000; George Haseotes—$999,000; H. Marty—$484,000; J. Tambakis—$484,000; Bentas—$0; P. Pantazelos—$484,000; V.S. Haseotes & Sons (a partnership owned by all seven siblings)—$5,780,000. Most of the $17,500,000 of Haseotes' loans came from funds advanced by Chemical Bank to various shipping companies he owned which were secured by a lien on the shipping company assets. Haseotes personally guaranteed payment of this Chemical Bank loan.[5]

Seeing his ownership of the refinery as an opportunity to own and operate oil tankers profitably, Haseotes in 1987 bought three oil tankers for $25 million, borrowing most of the money for the purchase. He owned and operated the ships through several companies. He held all the capital stock of Boston Ocean Carriers, Inc. ("BOC") and Plymouth Marine Corp. He also held a 100% interest in the following entities, each of which owned a single oil tanker: Belmont VLCC I, Belmont VLCC II and Belmont VLCC III. BOC managed the Belmont companies, chartering their ships to CCP and third parties. Plymouth Marine Corp. held all the stock of Empire Marine, which chartered its vessels to Plymouth Marine Corp.

The operations of the refinery were never profitable. When its finances became desperate, Haseotes could have sold the shipping companies and put the net sales proceeds into the refinery operations. Doing this would have been an alternative to obtaining funds through the Chemical Bank loan. He had bought the ships for $25 million, paid for by a $20 million bank mortgage, loans from family members and his own funds. Reconditioning cost almost another $5 million. Prior to the Chemical Bank loan he received an offer to purchase the three ships for $71 million. He decided not to accept this offer because a sale would generate taxes on the profit of about $49 million, whereas debt financing would be nontaxable.

Neither CCP nor NPL was able to pay Cumberland's loans to them. As stated, CCP's $52,049,437 note dated as of October 1, 1987 was rewritten as of December 31, 1989 to be payable on demand but no later than October 10, 1990.

Cumberland and CCP had previously entered into a subordination agreement dated as of December 31, 1988. In the agreement CCP recognized its large debt to Cumberland and the smaller debts owed to Haseotes and the others then totaling $14,906,311, the latter debt being referred to in the agreement as "Subordinated Debt." In section 2(c) of the subordination agreement CCP promised that upon a default in CCP's note payable to Cumberland, CCP

> shall not, directly or indirectly, make any payment of the principal amount of, interest on or fees or other charges in respect of the Subordinated Debt....

The agreement defines "Subordinated Debt" as debt due under the "Subordinated Promissory Notes." The latter are in turn defined as the promissory notes listed in Annex A to the agreement "together with any substitute or additional promissory note issued in respect of moneys advanced or credit made available to [CCP]" by family members (with the exception of a note payable to V.S. Haseotes and Sons Limited Partnership). Annex A lists CCP notes held by family members and family partnerships having a total principal

5. Haseotes used some of the Chemical Bank loan proceeds to make advances to Cumberland, which were later repaid.

amount of $14,906,311. Included in the list is a December 31, 1988 CCP note payable to Haseotes in the principal amount of $4,083,311. CCP also promised, in section 2(a) of the agreement, to make no payments on the Subordinated Debt "except to the extent that, after such repayment of principal, the aggregate outstanding and unpaid principal amount of the Subordinated Debt shall equal or exceed 14,906,311."

CCP's note payable to Cumberland was not paid on its due date, October 10, 1990, and was thereafter in default. By 1991 CCP's failure to pay the note was having a disastrous effect upon Cumberland's operations. This was apparent to all, including Haseotes. Under pressure from Bentas and other board members, Haseotes agreed to consider a sale of the refinery. He had in mind that the refinery was worth $250 million. CCP had previously entered into an agreement with J. Aron & Company ("J. Aron") to refine through NPL crude oil owned by J. Aron. In 1991 J. Aron offered to purchase a 51% interest in the refinery for $70 million. At the Cumberland board meeting of July 10, 1991 the directors voted unanimously (with Haseotes abstaining) to approve and support the "concept" of the proposed sale to J. Aron and to provide Cumberland personnel to assist in consummating the sale. IBJ was also in favor of the sale. At the board meeting of August 8, 1991 Haseotes informed his fellow directors that he was considering making a counter-offer to J. Aron. Haseotes also told the board there was another party interested in purchasing the refinery. Bentas is recorded in the minutes as expressing "her very strong interest in having [Cumberland] assist in consummation of a transaction with [J. Aron] or any other entity in order to stabilize economic circumstances at [Cumber-

land] . . . ." The board unanimously voted at this meeting (with Haseotes again abstaining) to appoint a committee to work with CCP and NPL to respond to the J. Aron proposal. Despite all this pressure, Haseotes refused to consummate a sale along the lines of the J. Aron proposal. Bentas pleaded with Haseotes to accept the offer because it would provide funds to pay much or all of CCP's debt to Cumberland. Haseotes told Bentas to "go to hell," saying he alone would make the decision because "it's my refinery."

The J. Aron sale was never consummated. Haseotes now admits this was a mistake. CCP never made any payment on its note payable to Cumberland.[6]

Cumberland's financial woes accelerated. By 1991 it was operating at a loss and was unable to buy sufficient products for its convenience stores and gas stations. A sale of the refinery was no closer in early 1992. On May 1, 1992 Cumberland filed with this court a petition for reorganization under chapter 11. CCP's failure to make payment on the note was the principal cause of Cumberland's financial crisis.

When Cumberland filed its chapter 11 petition on May 1, 1992 it had received no payment on its loans to CCP since 1988. The same cannot be said of the loans made to CCP by Haseotes. On December 31, 1991, CCP owed Haseotes $17,549,551.97.[7] By May 1, 1992, the chapter 11 petition filing date, Haseotes had caused CCP to pay this debt down to $13,549,542.61, a reduction of $4,000,009.36. He directed that some of these payments be made to certain of his shipping companies. Thereafter, while the chapter 11 case was pending, CCP continued to pay down the debt owed Haseotes, so that by March 10, 1993

---

**6.** In August of 1993 the refinery was sold to Vitol S.A. Inc., a Swiss corporation, in a transaction which brought no payment to Cumberland under the CCP note. Payment of other refinery debt consumed the entire sales proceeds. In 1996 Cumberland recovered judgment against CCP in the sum of $50,042,-737 (the total of the CCP advances) plus inter-

est. The difference between this figure and the $52,049,437 principal sum of CCP's note payable to Cumberland was unexplained at trial.

**7.** The balance had been as high as about $21.9 million in April of 1991.

the balance it owed him was $11,796,-372.92, a further reduction of $1,753,169.69. The total of these payments, $5,753,179.05, is the amount of Cumberland's setoff claim asserted here. The payments were prompted by Chemical Bank pressing Haseotes on his personal guaranty. Most of the funds ended up with Chemical Bank.

The other members of the Cumberland board, including Bentas, were unaware of the 1992 and 1993 CCP payments to Haseotes and the shipping companies. So was the official committee of unsecured creditors. The payments were discovered in January of 1993 by financial consultants engaged by Cumberland. Upon being informed of the payments, the creditors' committee was furious. It threatened to move for the appointment of a trustee. To mollify the committee, Cumberland on March 16, 1993 entered into an agreement with Haseotes which prohibited further payments by CCP, NPL or NEL to him or his entities. Haseotes promised to use his best efforts to consummate the sale of the refinery to Vitol S.A. Inc. which was then pending. The agreement also prohibited Haseotes from being involved in the day-to-day management of Cumberland's business and from communicating with Cumberland's employees (except as to certain petroleum matters) other than at meetings of the board of directors.

On October 22, 1993 I confirmed Cumberland's plan of reorganization, effective December 30, 1993. The plan provided for a 100% payment (plus interest) to general unsecured creditors, who were placed in Class 12, with payments to be made over a five year period ending on December 31, 1998. Each Class 12 creditor was to be issued a "Class 12 Certificate of Indebtedness."

The foregoing constitutes my principal findings of fact. Other findings appear in discussions of the relevant legal issues.

8. The present claim objection is but one aspect of an intra-family dispute. Cumberland's voting stockholders are in two 50% camps. As a result, there is no agreement on the composition of its board. Cumberland is now in deadlock proceedings in the Delaware Chancery Court.

## II. *PROCEDURAL BACKGROUND*

Article 8.3(c) of Cumberland's plan of reorganization prevents payment of debt owed to Haseotes and other stockholders until payments to Class 12 creditors are completed under the plan. The Class 12 creditors were paid in full by December 31, 1998. Haseotes thereafter demanded that Cumberland pay his claim in full, which Cumberland declined to do.[8]

On June 10, 1999, Haseotes filed a motion to compel payment, entitled "Motion to Determine Classification and to Compel Payment of Allowed Claim." At the conclusion of the hearing on the motion, I entered the following order: "The claim is a Class 12 Claim with respect to which the debtor has preserved whatever setoff rights it has." I made no order on the merits of the Haseotes claims or the merits of Cumberland's setoff rights. I instead set the matter down for an evidentiary hearing. Believing it would be helpful in trying the case to have a filed objection to the claims spelling out Cumberland's setoff claims, I ordered Cumberland to file an objection to the claims.

## III. *HASEOTES' DUTY OF LOYALTY AND FAIR DEALING*

There is a threshold choice of law question on Cumberland's setoff claim. Cumberland is incorporated under the laws of Delaware. But all the actions of Haseotes of which it complains, including the payments to him, took place in Massachusetts. I must apply the law of the forum state, Massachusetts, including its decisions on conflict of law principles. *See, e.g., Millipore Corp. v. Travelers Indemnity Co.,* 115 F.3d 21 (1st Cir.1997); *Roy v. Star Chopper Co., Inc.,* 584 F.2d 1124 (1st Cir.1978); *Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.),* 108 B.R. 384 (Bankr.D.Mass.1989). The Supreme

Judicial Court of Massachusetts has in the past applied the law of the state of incorporation in adjudicating the liability of corporate directors. *See Beacon Wool Corp. v. Johnson,* 331 Mass. 274, 119 N.E.2d 195 (1954). More recently, however, it has looked to the law of the state which has the most significant relationship to the parties and the transaction in question. *See New England Telephone & Telegraph Co. v. Gourdeau Constr. Co., Inc.,* 419 Mass. 658, 647 N.E.2d 42 (1995) (applying statute of limitations of state where contract was executed and where parties had principal places of business); *Bushkin Assocs., Inc. v. Raytheon Co.,* 393 Mass. 622, 473 N.E.2d 662 (1985) (applying statute of frauds of state with most significant relationship to transaction and parties).

In *Demoulas v. Demoulas Super Markets, Inc.,* 424 Mass. 501, 677 N.E.2d 159 (1997), the court was faced with the situation we have here—a duty of loyalty case involving a Delaware corporation in which predicate acts took place in Massachusetts. It described its recent decisions as favoring a "functional approach to resolving choice of law issues on the basis of a 'significant relationship' ". 677 N.E.2d at 169. It nevertheless declined to decide the general question whether the law of the state of incorporation would continue to be followed. The court did so because the corporation before it was a Delaware corporation during some of the events in question and had been reincorporated in Massachusetts prior to the others. The court believed that applying two different sets of corporate laws to separate aspects of the same course of conduct would be overly formalistic. It concluded that Massachusetts law should be applied, stating: "None of the parties in this case has any relationship to Delaware beyond the mere fact of DSM's initial incorporation there,

and all of the claims involve occurrences either in Massachusetts or New Hampshire, not Delaware." *Id.* I conclude from *Demoulas* that the Supreme Judicial Court of Massachusetts would apply Massachusetts law to the facts here.[9]

I now turn to the merits. *Demoulas* contains this statement of the governing principles:

> The directors of a corporation stand in a fiduciary relationship to the corporation. . . . They owe to the corporation both a duty of care and, more significantly for this case, a paramount duty of loyalty. . . . They are bound to act with absolute fidelity and must place their duties to the corporation above every other financial or business obligation. . . . They cannot be permitted to serve two masters whose interests are antagonistic.

*Id.* at 179–80.

*Demoulas* involved, primarily, the corporate opportunity doctrine, which the court described in these words: "The corporate opportunity doctrine is rooted in the principle that corporate directors and officers are bound by their duty of loyalty to subordinate their self-interests to the well being of the corporation. A person who owes a fiduciary duty to a corporation is prohibited from taking, for personal benefit, an opportunity or advantage that belongs to the corporation." *Id.* at 180. Perhaps the most common instance of breach of a director's duty of loyalty is misappropriation of a corporate opportunity. *See, e.g., Black v. Parker Mfg. Co.,* 329 Mass. 105, 106 N.E.2d 544 (1952); *Production Mach. Co. v. Howe,* 327 Mass. 372, 99 N.E.2d 32 (1951); *Durfee v. Durfee & Canning, Inc.,* 323 Mass. 187, 80 N.E.2d 522 (1948); *Hanover Ins. Co. v. Sutton,* 46 Mass.App.Ct. 153, 705 N.E.2d 279 (1999).[10]

---

**9.** The choice of law does not, in any event, appear to be crucial. Although Delaware and Massachusetts may have their differences on a director's duty of care and the business judgment rule, matters not before me, I discern no principled difference between them

on questions concerning a director's duty of loyalty.

**10.** A similar doctrine applies to a partnership. A partner cannot appropriate for himself an opportunity belonging to the partnership.

■ A director's duty of loyalty has of course broader ramifications than the corporate opportunity doctrine. If a director is personally involved in a transaction with his corporation, the transaction must be fair to the corporation. *See Demoulas*, 677 N.E.2d at 184–85; *Puritan Medical Ctr., Inc. v. Cashman*, 413 Mass. 167, 596 N.E.2d 1004, 1008 (1992). Directors, indeed any employee, are barred from acting in competition with the corporation while they are in its service. *See, e.g., Chelsea Industries, Inc. v. Gaffney*, 389 Mass. 1, 449 N.E.2d 320 (1983) (allowing employee to plan competition while employed but not to take any substantive action in furtherance of plan).

■ This case does not fit neatly within any of these traditional categories. Haseotes engaged in no transaction with Cumberland when he caused CCP to make payments to him and his corporations. Indeed, the gravamen of Cumberland's complaint is the absence of such a transaction; i.e., CCP's nonpayment to Cumberland. Nor did Haseotes engage in a business competing with Cumberland. But there is some analogy here. Haseotes did compete with Cumberland in seeking payments due from CCP. And one could also analogize the availability in CCP of funds for debt payment as a corporate opportunity appropriated by Haseotes.

Analogies, however, can limp. Application of a fiduciary's duty of loyalty needs none. The governing principles are broad and pervasive. The *Demoulas* court recognized their breadth in formulating this statement of the corporate opportunity doctrine:

> The corporate opportunity doctrine is rooted in the principle that corporate directors and officers are bound by their duty of loyalty to subordinate their self-interests to the well being of the corporation. A person who owes a fiduciary duty to a corporation is prohibited from taking, for personal bene-

fit, an opportunity or advantage that belongs to the corporation.... In selecting a test for determining which ventures rightfully belong to a corporation, and are subject to the corporate opportunity doctrine, the corporation deserves broad protection. Rather than limiting the doctrine's coverage only to those instances where the proposed venture is demonstrably similar to existing and prospective corporate activities, the focus is on the paramount obligations of the fiduciary. In keeping with this principle, we have stated that "the true basis of the governing doctrine rests fundamentally on the unfairness in the particular circumstances of a director, whose relation to the corporation is fiduciary, 'taking advantage of an opportunity [for his personal profit] when the interests of the corporation justly call for protection. This calls for the application of ethical standards of what is fair and equitable ... [in] particular sets of facts.' " [citation omitted] This "fundamental fairness" test places the burden on the fiduciary who acquires a corporate (or partnership) opportunity, or who engages in self-dealing, "to prove that his or her actions were intrinsically fair, and did not result in harm to the corporation or partnership." [citation omitted]

*Demoulas*, 677 N.E.2d at 180.

*Meehan v. Shaughnessy*, 404 Mass. 419, 535 N.E.2d 1255 (1989), cited in *Demoulas*, involved the fiduciary duty that law partners owe their partnership when they withdraw from the partnership. The withdrawing partners had stolen a march on the partnership by contacting clients to seek their continued patronage. The court ruled this conduct gave the withdrawing partners an unfair advantage over the partnership. It barred them from keeping any clients whose retention was brought about by this solicitation. In doing so the court emphasized basic principles of fairness.

*See, e.g., Wartski v. Bedford*, 926 F.2d 11 (1st Cir.1991).

The Massachusetts case which is perhaps closest to our facts is *Zimmerman v. Bogoff,* 402 Mass. 650, 524 N.E.2d 849 (1988). It involved a corporation in the business of manufacturing metal castings. The plaintiff and defendant each owned 50% of the corporation's shares. They also had their own separate businesses. The corporation utilized the equipment and employees of each of these businesses in performing its manufacturing operations. The defendant was in charge of finances. When the corporation ran into financial difficulties, the defendant caused it to pay debts owed to his companies but not debts owed the plaintiff or his company. The defendant also formed a new corporation to take over the operation of the enterprise. This all led to the demise of the plaintiff's company. The court looked to the fiduciary obligations which shareholders of a close corporation owe to each other. It concluded, in rather summary fashion, that the defendant had violated these obligations, stating: "In his position as 'control[ler] of the purse strings of the enterprise,' [defendant] caused [the jointly owned corporation] to withhold from [plaintiff's corporation] substantial sums which were legitimately due. His actions ultimately led to the total financial demise of [plaintiff's corporation]. This was a clear breach of fiduciary duty." *Id.* at 855. For our purpose, there is no significant difference between the fiduciary duties owed each other by shareholders of a close corporation and the fiduciary duties owed by a director to his corporation. Although not expressly stating so, the court in *Zimmerman* was applying the same principles of fundamental fairness it later articulated in *Demoulas.*

I examine Haseotes' actions under this broad standard of fundamental fairness. His decision to have CCP pay him and his shipping companies, but not Cumberland, should not be viewed in isolation. The purchase of the refinery was his idea. The others consented, but he was the driving force behind the project. Although he had told his siblings that they or Cumberland would somehow benefit from the refinery, the discussions were too vague to be legally enforceable. By his own admission, Haseotes was the sole beneficial owner of the refinery entities. And notwithstanding his testimony to the contrary, there never was any talk of his brothers or sisters having an option to purchase that ownership interest.

The refinery's start-up and operation were a disaster. Haseotes should never have purchased it in light of his lack of experience in the business of refining crude oil. He received competent advice against the purchase, yet went ahead anyway. He was motivated by old-fashioned greed, that powerhouse of capitalism. Intending that Cumberland be the refinery's principal customer, he thought he would make a fortune from it. And he sought to enhance that fortune through the operation of oil tankers delivering crude oil to the refinery.

There would perhaps be nothing wrong with this conduct if the refinery's purchase and operation had been financed with his own funds. But that was not the case. Cumberland was the principal funder. Haseotes never should have put Cumberland in the position of being such a large unsecured creditor of an untried and risky enterprise. The loans in themselves were unfair.

Even if the loans were fair, Haseotes was bound to subordinate his personal interests to the interests of Cumberland with respect to their repayment. His conduct concerning repayment is even more deplorable than what he did in creating the loans. He was aware of the havoc the loans were wreaking on Cumberland's finances. Yet he felt no imperative to use every effort to have them repaid. He refused to accept what he now admits was a fair offer to purchase a 51% interest in the refinery, a purchase which would have provided substantial sums to Cumberland. Yet he saw CCP's payment of his loans in a different light. Here there was a repay-

ment imperative. He offers Chemical Bank's collection efforts as an excuse for the repayments. But it was he who put the Chemical Bank loan in place. He knew his personal guaranty of that loan was its lynch pin. Moreover, there never had to be a Chemical Bank loan if he had sold his ships and used the funds to alleviate Cumberland's distress. He did not sell the ships for the same reason he did not accept the refinery purchase offer. He could not bring himself to end his fantasy of making a fortune in the business of crude oil.

There is more. Cumberland's note was in default after October 10, 1990. In the December 31, 1988 subordination agreement CCP promised that, so long as Cumberland's note was in default, it would not, directly or indirectly, make any payment on its existing note payable to Haseotes "or any substitution or additional promissory note." Yet after October 10, 1990 Haseotes caused CCP to make payments to him. He thus brought about a breach of the subordination agreement. Such disregard of Cumberland's rights is hardly fitting conduct for its fiduciary.

Haseotes contends there has been no violation of his fiduciary obligations because these loan repayments involved no transaction between him and Cumberland, no misuse of Cumberland's property and no misuse of information that came to him in his official capacity. But the broad standard of fundamental fairness is not so technically circumscribed. Even the corporate opportunity doctrine does not require that the business opportunity come to the attention of the defendant in the exercise of his official duties, or be taken advantage of through use of corporate funds. *See, e.g., Hanover Ins. Co. v. Sutton,* 46 Mass.App.Ct. 153, 705 N.E.2d 279 (1999) (opportunity learned of by defendant from another while they were in process of planning new venture). One definition of a corporate opportunity, cited with approval in *Demoulas,* includes an opportunity acquired in the course of employment, through use of corporate information or property, or "[a]ny opportunity to engage in a business activity of which a senior executive becomes aware and knows is closely related to a business in which the corporation is engaged or expects to engage." *American Law Institute, Principles of Corporate Governance: Analysis and Recommendations* § 5.05(b) (1994).

■ Haseotes mounts another argument. He contends the repayments were not only disclosed to Cumberland but were "actually made and approved" by it, and that Cumberland's "involvement with the repayments on all levels" show its consent to them.

Haseotes refers here to the mechanics of the CCP payments. All transactions among family members, family partnerships, Cumberland, CCP and NEL were handled and recorded by employees of Cumberland at its Canton headquarters. The 1992 and 1993 payments in question were effected by wire transfers handled by John Daley, who was Cumberland's cash manager. His immediate supervisor was Donna Walsh, Cumberland's assistant treasurer at the time. The required procedure for transactions among family members and affiliated entities was this: the initial request for a transaction would be made to Walsh, who had to get approval from either Holt or Bentas. Holt was at the time an assistant treasurer of CCP and vice president of Cumberland. Although Holt was no longer Cumberland's chief financial officer, his skills in financial matters were still used in family transactions. This procedure was put in place because Holt and Bentas were essentially financial people. Walsh testified that in the vast majority of intra-family payments she obtained prior approval from Holt and only occasionally from Bentas. She did not testify as to who gave approvals for the particular payments in question. She did recall that it was Haseotes who made the requests of her for the payments. Bentas has no recollection of approving the pay-

ments. I find that it was Holt, not Bentas, who approved all these payments.

Walsh gave Haseotes, Bentas and Holt periodic one-page reports of the balances owed as the result of transactions among family members, family partnerships, Cumberland, CCP and NEL. The reports, entitled "Individual Investment Analysis," were rendered on a quarterly basis. During the period in question, Walsh furnished such reports to Haseotes, Holt and Bentas on December 31, 1991, March 31, 1992, June 30, 1992, September 30, 1992, December 31, 1992 and June 30, 1993. At the top portion of these reports there were five columns, each showing a debit or credit balance, and a sixth column showing a net debit or credit balance. One of these columns was devoted to CCP. At the bottom of the page there appear nine additional columns containing details on partnership allocations and individual investments by family members. The reports show, among many other things, that the debt owed by CCP to Haseotes was decreasing during 1992 and 1993. The December 31, 1991 report shows the debt at $16,795,278. The June 30, 1993 report lists it at $11,-796,373.

Bentas received these reports, but she only glanced at them if she looked at them at all. As president and CEO of Cumberland during these days of crisis, she was devoting all her energy and attention to Cumberland's situation, not family transactions. I find that she did not learn from the reports that CCP was paying down its debt to Haseotes.

It is clear from the written evidence that she disapproved of any such pay downs. On June 15, 1990 she sent a memo to her three brothers complaining of a $190,000 payment by CCP to one of Haseotes' shipping companies. She noted in the memo that she had no control over CCP's bank account. On September 4, 1990 she sent a memo to her brothers George and Byron saying that Haseotes had informed her of a $500,000 payment by CCP to one of his shipping companies. She noted: "Since he

is the sole owner of [CCP], I cannot stop them from doing this; however, I totally disagree."

I conclude that neither Bentas nor any disinterested member of Cumberland's board consented to any of these payments. Indeed, they did not even know of the payments until early 1993.

The quarterly reports, moreover, fell far short of the type of disclosure required of Haseotes as a fiduciary of Cumberland. They were so full of extraneous detail that they required careful study, and comparison with prior reports, to learn of these payments. And, as assistant treasurer of CCP, Holt was not disinterested in approving CCP's payments to Haseotes. This is accentuated by the close relationship he had with Haseotes. More than any other family member, Haseotes had Holt's allegiance. In disclosing the payments to Holt, therefore, Haseotes did not even make disclosure to a disinterested senior officer of Cumberland. Holt was not a member of the board. There was no disclosure to a disinterested majority of Cumberland's board, and there was certainly no consent by a disinterested majority. Haseotes never sought the board's consent to or ratification of these payments.

■ The result would be the same if the Walsh reports had been sent to the entire board. The Supreme Judicial Court of Massachusetts has been especially strict in fixing the requirements which must be met for there to be ratification of malfeasance by a fiduciary, stating:

> No half-hearted disclosure or partial discovery is sufficient.... The trustee's duty of disclosure is not discharged by leaving the cestui to draw doubtful inferences, conclusions and suspicions....

*Puritan Medical Ctr., Inc. v. Cashman,* 413 Mass. 167, 596 N.E.2d 1004, 1008 (1992) (quoting from *Durfee v. Durfee & Canning, Inc.,* 323 Mass. 187, 80 N.E.2d 522, 531 (1948)).

Haseotes tries to distinguish *Puritan,* saying that here Cumberland handled all

the payments and had exclusive access to all the information, whereas in *Puritan* it was the fiduciary who made the payments and had access to the information. All the records were fully available to everyone, he says, and nothing was hidden. Haseotes implies that Cumberland was negligent in not acquiring all information pertaining to these payments.

The principles enunciated in *Puritan* cannot be so easily set aside. They apply equally to the present case. The court said in *Puritan:*

> While it is true that officers and directors have a duty of reasonable supervision ... this duty is for the benefit of the corporation, not the wrongdoer.... [T]here may be no ratification of self-dealing without full disclosure.... The cases in which courts imply ratification, unlike this case, involve third-party, arm's-length transactions from which the· corporation received a benefit, and directors who, at minimum, had "knowledge of such facts or circumstances as would put a reasonable person on inquiry and which would lead to full discovery...."

*Puritan,* 596 N.E.2d at 1008.

■■■ Haseotes makes a last-ditch defense. He says that in asserting its setoff claim Cumberland has failed to establish a causal link between the conduct it complains of and the damages it seeks.[11] Haseotes observes that CCP had many creditors. He points out that Cumberland has not shown CCP would have paid it rather than other CCP creditors. That misses the point. Having improperly placed Cumberland in a precarious position as CCP's unsecured lender, Haseotes was bound to use all reasonable efforts to see that Cumberland was repaid. If CCP was able to pay Haseotes it was able to pay Cumberland. Haseotes should have brought about that payment. Moreover, to recover against its fiduciary a corporation need not always show it has been damaged by the fiduciary's conduct. An insider's wrongful profit in matters such as dealing in the corporation's securities does not cause the corporation damage. Yet, to deter such conduct, the corporation is permitted to recover the ill-gotten gain. *See, e.g., Champion Home Builders Co. v. Jeffress,* 490 F.2d 611 (6th Cir.), *cert. denied,* 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974) (absence of damages irrelevant in assessing liability for director's fraudulent dealing in corporate securities); *see also George H. Gilbert Mfg. Co. v. Goldfine,* 317 Mass. 681, 59 N.E.2d 461 (1945) (director accountable to the corporation for profits gained by subordinating his obligation to corporation to his personal pecuniary interests); *Lydia E. Pinkham Medicine Co. v. Gove,* 303 Mass. 1, 20 N.E.2d 482 (1939) (corporate director who breached fiduciary obligation is bound to make restitution of any resulting profit gained).

## IV. *STATUTE OF LIMITATIONS*

On the morning of the first day of trial, Haseotes filed a motion to dismiss Cumberland's setoff claim on the ground that the applicable three year statute of limitations barred the claim. With the consent of Cumberland, I set the motion down for argument the next day and began the trial. I denied the motion at the conclusion of the hearing held the following day. I did so for two independent reasons—the tolling provision contained in the plan and the motion's untimeliness. Because I may not have adequately articulated those grounds at the hearing, I will briefly treat them here.[12] And there is a third ground for denial of the motion—res judicata.

---

11. Haseotes has other arguments, such as estoppel and an asserted credit for his advances to CCP. These contentions have been largely answered. To the extent they have not, they lack sufficient merit to warrant extending this lengthy opinion.

12. I assume, without deciding, that the statute of limitations applies to a claim asserted by way of setoff.

### *Tolling*

 The parties agree that Massachusetts law governs.[13] In Massachusetts, a cause of action for breach of fiduciary duties is in the nature of a tort action, which must be commenced within three years after the cause of action accrues. *See* Mass.Gen.Laws ch. 260, § 2A (Law. Co-op.1992); *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 677 N.E.2d 159, 172–73 (1997). Where a fiduciary relationship exists, a fiduciary's failure to adequately disclose facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct. This equates to fraudulent concealment within the meaning of the Massachusetts statute that excludes the period of fraudulent concealment of a cause of action in determining the time limit for commencement of the action. *See Demoulas,* 677 N.E.2d at 174; *see also* Mass.Gen.Laws ch. 260, § 12 (Law.Co-op.1992). Cumberland learned of CCP's payments to Haseotes in January of 1993 when they were discovered by its financial advisor, thus triggering the running of the statute. Without a tolling of the statute, the three year period had obviously expired by June of 1999 when Cumberland asserted its setoff claim in defending against the motion filed by Haseotes to compel payments.[14]

Article 6.1(e)(9)(C) of the plan of reorganization contains a tolling provision in its last sentence. Article 6.1(e)(9)(C) reads in its entirety as follows:

> The Company shall not waive claims against D.B. Haseotes or D.B. Haseotes-related entities with respect to certain allegedly improper payments by Cumberland Crude Processing, Inc., Newfoundland Processing Ltd. or Newfoundland Energy Ltd. or any other refinery entity after the Petition Date until payment of the Class 12 Certificates of Indebtedness in full; provided that the Company does not intend and shall not be required to commence suit against D.B. Haseotes or D.B. Haseotes-related entities with respect to any such allegedly improper payments. After the occurrence of an event of default and acceleration of the Class 12 Certificates of Indebtedness, the Company agrees to initiate suit against D.B. Haseotes and/or D.B. Haseotes-related entities to recover any such allegedly improper payments if so instructed by the Post-confirmation Committee. D.B. Haseotes and the D.B. Haseotes-related entities will agree to enter into a tolling agreement with respect to the statute of limitations relating to any such allegedly improper payments, which tolling agreement will expire on the date the Class 12 Certificates of Indebtedness have been paid in full.

 Haseotes and Cumberland never entered into a tolling agreement, for reasons that have not been explained. As a result, Haseotes contends there has been no tolling. There can be no doubt he was obligated to make a tolling agreement. He has admitted he voted in favor of the plan. He thereby consented to this plan provision. And, having received proper notice in the confirmation process, confirmation of the plan binds him under principles of res judicata.

 Being bound to enter into a tolling agreement, Haseotes cannot escape tolling on the ground no agreement was signed. There is an equitable maxim which treats as done that which should be done. *See, e.g., Independent Wireless Telegraph Co. v. Radio Corp.*, 269 U.S.

---

**13.** *See* Part III, *supra,* concerning the conflict of law question.

**14.** Cumberland asserts the three-year statute was tolled from December 30, 1993, the effective date of its plan, to December 31, 1998, when payment in full of the Class 12 Certificates of Indebtedness was completed. It therefore makes no difference for our purpose whether the cause of action accrued when each payment was made, the first having been made in January of 1992, or when Cumberland learned of the payments in January of 1993.

459, 473, 46 S.Ct. 166, 70 L.Ed. 357 (1926); *Camp v. Boyd,* 229 U.S. 530, 559, 33 S.Ct. 785, 57 L.Ed. 1317 (1913); *Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.),* 186 B.R. 9, 16 (Bankr.D.Mass.1995), *aff'd,* 212 B.R. 10 (D.Mass.1997), *aff'd,* 186 F.3d 1356 (Fed. Cir.1999); *Morris Gordon & Son, Inc. v. Totoni,* 324 Mass. 182, 185–86, 85 N.E.2d 319 (1949); *Lonergan v. Highland Trust Co.,* 287 Mass. 550, 559, 192 N.E. 34 (Mass.1934). That maxim has extra force here in view of the heavy fiduciary obligation imposed on Haseotes to be fair in his dealings with Cumberland. The statute of limitations was therefore tolled from December 30, 1993, the effective date of plan confirmation, to December 31, 1998, the date by which all Class 12 Certificates of Indebtedness were paid in full.

■ Haseotes has a different interpretation of the plan's tolling provision, even if it has the force of a tolling agreement. He says the phrase "which tolling agreement will expire on the date the Class 12 Certificates of Indebtedness have been paid in full" means that once that date passed the tolling agreement has no effect. I disagree. What was to expire was the period of tolling only. After December 31, 1998, the statute began running again. The Haseotes interpretation makes little sense. It would give Cumberland no opportunity whatsoever to assert its setoff claim. This is inconsistent with Article 8.3(a) of the plan, which expressly reserves "offset rights" against the claims of Haseotes (and other stockholders).[15] It is also inconsistent with the non-waiver language of Article 6.1(e)(9)(C) quoted above. Preservation of those offset rights beyond December 31, 1998 was particularly important for Cumberland. Under Article 8.3(c) of the plan, the claims of Haseotes were subordinated to the claims of holders of Class 12 Certificates of Indebtedness.[16] So Haseotes had no right to immediate payment until all Class 12 Certificates of Indebtedness were paid in full. It was only after that time when Cumberland's setoff rights would be of any use to it.

■ Haseotes has another interpretive argument on Article 6.1(e)(9)(C) of the

15. Article 8.3(a) states:

*Preservation of Certain Claims Against Shareholders and Affiliates.* Anything contained in this Plan to the contrary notwithstanding (but subject in any event to any rights of offset of the Company which shall not be affected in any way by any standstill or similar agreement contemplated by this Section 8.3(a), which offset rights shall survive such standstill or similar agreement), except as the Company may otherwise agree in writing with the Creditors Committee prior to the Confirmation Date or as otherwise provided in Section 6.1(h)(9), any claim held by the Company against any Holder of an Equity Interest in the Company or any person or entity who or that is an affiliate of the Company shall not be released and shall be subject to a standstill or similar agreement for a period of not less than 10 years.

16. Article 8.3(c) of the plan provides:

*Subordination of Certain Other Claims.* Except as otherwise provided in Section 8.3(b) (but subject in any event to any rights of offset which shall not be affected in any way by any subordination or similar agreement contemplated by this Section 8.3(c) and shall survive any such subordination), any Claim held by any Holder of an Equity Interest or any person who is an affiliate of the Company (other than Conven Petro Insurance Co.) shall be subordinated to the obligations of the Company under the Class 12 Certificates of Indebtedness and shall not be paid unless and until the Class 12 Certificates of Indebtedness have been paid in full; provided, however, that in the event that any Holder of such a subordinated Claim (other than any holder of Class A voting common stock) objects to such subordination, the permissibility of such subordination shall be submitted to the Bankruptcy Court for determination and, if the Bankruptcy Court determines that such subordination is impermissible, such Claim shall be treated as a Class 12 Claim if and to the extent otherwise Allowed; provided, further, that the Unsecured Claims of Hytho Pantazelos, as trustee of the George and Marion Pantazelos Income Trust, the Marion A. Pantazelos Trust and the George P. Pantazelos Trust, respectively, in the aggregate amount of $132,309.40, shall not be subordinated and shall be allowed in the aforesaid aggregate amount as Allowed Class 12 Claims.

plan. He contends the phrase "such allegedly improper payments" appearing in the tolling provision contained in the last sentence refers only to the $1,753,169.69 postpetition payments made to him after May 1, 1992, not the $4,000,009.36 of prepetition payments. To understand this reference, he says, it is necessary to go back to the article's first sentence where the phrase "certain allegedly improper payments" appears in the same sentence with "after the Petition Date." Haseotes contends that "after the Petition Date" modifies "certain allegedly improper payments," so that the tolling provision in the last sentence covers claims against Haseotes only as to CCP's payments made to him after May 1, 1992, which total $1,753,169.69.

I again disagree. The phrase "after the Petition Date" in the article's first sentence modifies "shall not waive." The first sentence merely bars Cumberland from taking any action after the petition date to waive claims against Haseotes. This is so for several reasons. If the sentence were to have the meaning contended for by Haseotes, one would expect the draftsman to employ the verb "made" before "after the Petition Date." The location of "until payment of the Class 12 Certificates of Indebtedness in full" is also indicative. Clearly this modifies "shall not waive," making it much more sensible that "shall not waive" applies to the entire phrase "after the Petition Date until payment of the Class 12 Certificates of Indebtedness in full."

The Haseotes interpretation conflicts with more than good syntax. It makes no sense. Why would Cumberland ignore $4,000,009.30 of claims and want to toll the statute only on claims totaling the lesser sum of $1,753,169.69? And why would the creditors committee agree to a commitment not to waive only the lesser amount of claims? The committee was very much on top of this whole situation, as indicated by the clause's second sentence. As of

January of 1993 Cumberland and the committee were quite aware of both the prepetition and postpetition payments to Haseotes. Both categories of payments are readily apparent from the records maintained by Walsh. Finally, a commitment not to waive only claims as to postpetition payments is inconsistent with Article 8.3(a) of the plan, which preserves all of Cumberland's claims against Haseotes.

### *Untimeliness and Res Judicata*

██ Haseotes raised the statute of limitations as a defense for the first time when he filed his motion to dismiss on the first day of trial. That was too late. In June of 1999, Cumberland filed its opposition to Haseotes' motion to compel payment, together with its own cross-motion requesting a determination that it may properly exercise its offset rights. Haseotes filed (late) an opposition to that cross-motion. In that opposition, and during the hearing held on July 8, 1999, Haseotes made no contention that the statute of limitations bars the exercise of Cumberland's setoff rights. His argument was only that Cumberland had not preserved setoff because it had not filed an objection to the claim within the time set forth in the court's confirmation order (thirty days after the confirmation date), and because it had done nothing in the intervening years to assert setoff rights. I ruled at the hearing that the provisions in the plan preserving Cumberland's setoff rights made it unnecessary for it to file an objection to the Haseotes claim in order to assert those rights. I therefore entered an order declaring that Cumberland "has preserved whatever setoff rights it has." I nevertheless believed it would be helpful in sharpening the issues if Cumberland filed an objection to the claims spelling out its breach of loyalty claim, and I gave Cumberland ten days to do so. I then set the case down for trial.

██ Under our local rule,[17] Haseotes should have raised the statute of limita-

---

17. The rule provides:

tions as an affirmative defense in his opposition to Cumberland's cross-motion. Local rule aside, a defense of the statute of limitations should be pleaded in a timely manner, and not sprung on a plaintiff at the last moment. *See, e.g., Venters v. City of Delphi,* 123 F.3d 956, 968–69 (7th Cir. 1997) (court "must not countenance attempts to invoke [statute of limitations] defenses at eleventh hour, without excuse and without adequate notice to the plaintiff"); *International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers—Local 1603 v. Transue & Williams Corp.,* 879 F.2d 1388, 1396 (6th Cir.1989) (defense untimely when plead long after action was initiated); *Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152, 1155–56 (2d Cir.1968) (defense of limitations must be pleaded at earliest possible moment); *Peckham v. Ronrico Corp.,* 211 F.2d 727, 731 (1st Cir.1954) (statute of limitations defense raised too late where party initially asserted only laches in defense to motion); *Perlmutter v. Shatzer,* 102 F.R.D. 245, 246 (D.Mass.1984) (limitations defense waivable if not raised timely); *Steiner v. City of New York,* 920 F.Supp. 333, 342 (E.D.N.Y.1996) (statute of limitations defense is affirmative and must be asserted at earliest possible moment and is waived if not promptly pleaded).

I entered no order at the July 8 hearing requiring Haseotes to file a response to Cumberland's claim objection. In the normal course of events, a response must be made.[18] In this instance, however, Ha-

seotes had already given his response to the setoff claim, I had already ruled that Cumberland had preserved its setoff rights, and a trial date had been set. So there was no need for Haseotes to file a response. But that does not excuse his failure to assert the statute of limitations in response to Cumberland's cross-motion. The order preserving Cumberland's setoff rights is now res judicata on the limitations issue.

My order of July 8 also said this: "The rules of adversary proceeding [sic] shall apply." The only further pleading I had in mind was Cumberland's objection to the claim. But this sentence, or the local rule requiring a response to a claim objection, could perhaps be literally read to allow further pleadings. Had Haseotes so interpreted the order or rule and soon filed a response asserting the statute of limitations as a defense, he still would have a res judicata problem, but the defense would have been more timely than when presented by his motion to dismiss filed on the day of trial. But he did not even attempt to assert the defense in this manner.

## V. INTEREST AND ATTORNEYS' FEES

In his motion filed last June, Haseotes sought more than an order for immediate payment of his claim. He also requested that the court determine the classification of his claim under the plan. He argued his claim is either a claim falling within Class

---

party shall admit or deny each allegation of the motion, state any affirmative defense to the motion, and state specifically why the relief requested in the motion should not be granted.

M.L.B.R. 9013–1(j).

**18.** Local Rule 3007–1(c) provides:

If a claimant contests an objection to claim, the claimant shall file with the Clerk a written response to the objection, which response shall state with particularity why the proof of claim should be allowed, shall contain any documentation in support of allowance of the proof of claim, and shall state why the objection to the proof of claim

should be overruled. Any response to an objection to claim shall be served on the party objecting to the claim and any other party entitled to notice of the response. A claimant who does not file a timely response to a properly served objection to claim will be deemed to have agreed that the objection to claim may be sustained. The Court, in its discretion, may cancel a hearing on any properly served objection to claim to which a timely response has not been filed and may sustain the objection to claim without further notice or hearing.

M.L.B.R. 3007–1(c).

12 of the plan, in which event he is entitled to the same interest payments as the general Class 12 claimants, or it is unclassified and hence unimpaired, in which event he is entitled to interest and attorneys' fees pursuant to the terms of the notes supporting the claim.

In response, Cumberland asserted that the claim was a Class 12 claim because it fell within the catch-all language of section 2.3(a) of the plan, which reads as follows: *Class 12 Claims—Other Unsecured Claims*. Class 12 consists of all Allowed Unsecured Claims that are not included in any other class of Claims or Equity Interests. Class 12 does not include any Allowed Claim that is secured by a valid, perfected and non-avoidable Lien on property of the Estate, or that is subject to setoff under Section 553 of the Bankruptcy Code, which is an Unsecured Claim because the value of such Holder's Lien, or the amount subject to setoff, is less than the amount of such Allowed Claim.

Inconsistently, Cumberland also argued at the July 8, 1999 hearing that payment of the Haseotes claim was governed by provisions of the plan other than the plan provisions describing payment of Class 12 claims. Specifically, it contended the claim's payment was governed by the plan's provisions concerning setoff and subordination previously discussed, namely, sections 6.1(e)(9)(C), 8.3(a) and 8.3(c).

At the hearing, I entered the following order: "The claim is a Class 12 Claim with respect to which the debtor has preserved whatever setoff rights it has." On further reflection, I believe that order was partially in error. The claim is clearly not a Class 12 claim, despite the catch-all language of section 2.3(a). The plan gives the Haseotes claim a treatment which is entirely different from the treatment afforded Class 12 claims. The plan subordinates payment of the Haseotes claim to payment in full of Class 12 Certificates of Indebtedness. The plan also makes the claim subject to Cumberland's setoff rights. Ha-

seotes received no Class 12 Certificate of Indebtedness. Nor was his claim considered by the parties in estimating the total of the Class 12 claims for the purpose of Article 10.1(c), which makes it a condition to confirmation that Class 12 claims not exceed $50,000,000. The Haseotes claim is therefore unclassified under the plan. But it is certainly impaired. 11 U.S.C.S. § 1124 (Law.Co-op.Supp.1999).

The Bankruptcy Code, as well as other provisions of the plan, govern Haseotes' rights to interest and attorneys' fees. Unsecured claims accrue no postpetition interest. 11 U.S.C.S. § 502(b)(2) (Law.Co-op.1995). This general rule is confirmed by Article 12.8 of the plan, which provides: "Except as expressly stated in this Plan, or allowed by a Final Order of the Bankruptcy Court, no interest, penalty or late charge is allowed on any Claim or Equity Interest subsequent to the Petition Date."

Nor, just because there are attorneys' fee clauses in the notes, is Haseotes entitled to add to his claim expenses for attorneys' fees incurred subsequent to the petition filing date. Only a secured claimant is entitled to this benefit, and then only to the extent the fees are covered by the value of the collateral. 11 U.S.C.S. § 506(b) (Law.Co-op.1995). The plan confirms this as well. Article 12.9 reads: "No attorneys' fees shall be paid with respect to any Claim or Equity Interest except as specified herein or as allowed by a Final Order or the Bankruptcy Court."

Cumberland also contests Haseotes' computation of prepetition interest. The promissory notes provide for interest at the rate of 9%. The notes also contain a provision stating that "any overdue amount payable on ... the indebtedness ... shall bear interest ... at the rate of ten percent." The notes do not define "overdue amount." But these are demand notes. Presumably an amount is overdue only after demand is made. Haseotes

made no demand prior to the petition date. Haseotes contends that the language "from the date on which such amount shall have become due and payable on demand" indicates that interest is calculated at 10% once the notes reach maturity, not on actual demand. This ignores the prefatory language "any overdue amount." The proper prepetition interest rate is therefore 9%.

## VI. *CONCLUSION*

Cumberland has a valid setoff claim against Haseotes in the sum of $5,753,179. The Haseotes claims otherwise allowable total less than $2.949 million.[19] Cumberland therefore owes Haseotes nothing. To the contrary, it has a net claim against him in the sum of more than $2.804 million. A separate order has issued disallowing the claim in full.

---

**19.** This amount must be reduced to reflect the correct interest calculation.