# United States Court of Appeals
## For the First Circuit

---

No. 01-1344

IN RE:  CUMBERLAND FARMS, INC.

Debtor.

---

DEMETRIOS B. HASEOTES,

Appellant,

v.

CUMBERLAND FARMS, INC.,

Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Whitton E. Norris, III, with whom Carol R. Cohen and Davis, Malm & D'Agostine, P.C. were on brief, for appellant.

Patrick P. Dinardo, with whom Pamela Smith Holleman, Sullivan & Worcester LLP, and Mark G. Howard were on brief, for appellee.

**LIPEZ, Circuit Judge**.  In 1992, Cumberland Farms, Inc. ("Cumberland"), a close corporation owned by the six siblings of the Haseotes family, filed a petition for reorganization under Chapter 11 of the Bankruptcy Act.  Demetrios B. Haseotes -- one of Cumberland's directors and the appellant here -- filed claims against the corporation for roughly $3 million of prepetition indebtedness owed on certain promissory notes.  In response, Cumberland asserted a set-off claim of approximately $5.75 million, arguing that Haseotes breached his duty of loyalty when he caused his wholly-owned company to pay down a debt owed to him, while ignoring a much larger debt owed to Cumberland.  The bankruptcy court agreed, and disallowed Haseotes's claims against Cumberland.  On appeal, the district court affirmed. Haseotes then appealed to this court.  We affirm.

**I.**

A proper understanding of this case requires a somewhat detailed recitation of the facts, as found by the bankruptcy court. Haseotes is the oldest of six children who together own all of the shares of Cumberland.  The family business began in 1938, when Haseotes's parents bought a dairy farm in Cumberland, Rhode Island. Cumberland now owns more than one thousand convenience stores and gas stations, conducts wholesale operations in dairy and other products,

owns and manages real estate, and delivers refined petroleum products to its own gas stations and those of third parties. Through these various endeavors Cumberland enjoys a gross annual income of more than $1 billion.

The undisputed family leader, Haseotes became Cumberland's CEO and chairman of its board of directors in 1960. At that time, the corporation was just beginning the gradual process of growth and diversification. Cumberland opened its first gas station in the mid-1960s, linking together its existing food and gas operations. By the early 1970s, Cumberland owned roughly 150 gas stations up and down the east coast. However, the gas crisis of the 1970s nearly crippled the growing company, forcing it to close the majority of its new gas stations.

In the wake of the gas shortage, Haseotes became convinced that Cumberland needed greater security in its gas supply. In 1986, Cumberland entered into a petroleum supply agreement with Chevron U.S.A., Inc. But Haseotes was not satisfied with relying on an outside source for gas; he wanted to ensure a supply of his own. Thus, when he learned of a dormant refinery located in Newfoundland, Canada, he saw a valuable opportunity for expansion.

Having no experience in refining, Haseotes sought advice on the possibility of purchasing the refinery. One source told him that he would need to spend at least $25 million to get the refinery up and

running; another estimated that the cost would be closer to $100 million. Haseotes's consultant William Gorden, who recently had retired from Sun Oil Company, urged Haseotes not to buy the refinery. He told Haseotes that Sun Oil had lost money in its refinery operations, and that Cumberland's deal with Chevron provided it with an adequate source of refined petroleum products. Finally, Cumberland's legal counsel advised Haseotes that Cumberland could not own the refinery itself because certain states prohibit a company that operates a refinery from selling petroleum products at retail.

Undeterred, Haseotes decided to go ahead with the purchase. Based on the advice from counsel, he chose to own the refinery through his own wholly-owned entities. Thus, the refinery's physical assets were taken in the name of Newfoundland Processing, Limited, which was formed to conduct the oil refining operations. Haseotes also organized a separate corporation -- Cumberland Crude Processing, Inc. ("CCP") -- which would purchase crude oil, transfer it to the refinery, and sell the refined product to Cumberland and other third parties.

Notwithstanding Haseotes's nominal ownership of the refinery, the family had an unwritten (and somewhat vague) agreement that any profits from the refinery would accrue to Cumberland, and to the family as its shareholders. Based on that sense of common purpose, the family promptly loaned large sums of money to the refinery and to CCP, hoping to bring the refinery to working order. Those loans came from the

-4-

family members individually, but also -- and crucially for this case -- from Cumberland.  From 1986 through 1988, Cumberland loaned more than $50 million to CCP, and another $20 million to the refinery itself.  Cumberland's loans to CCP eventually were represented by a promissory note in the amount of $52,049,437, payable to Cumberland on demand, and no later than December 31, 1989.  Some time later, that note was replaced by a new one in the same amount, but payable no later than October 10, 1990.

Throughout the relevant time period, Cumberland's largest lender was the Industrial Bank of Japan Trust Company ("IBJ").  Its agreement with IBJ specified that Cumberland would put no more than $20 million into the refinery entities.  Not surprisingly, then, IBJ was not pleased to learn that Cumberland had loaned a total of roughly $70 million to the refinery and CCP.  As the CEO of Cumberland and the owner of CCP and the refinery, Haseotes bore the brunt of IBJ's displeasure.  In 1988, IBJ forced him to step down as Cumberland's CEO and to loan most of his share of Cumberland's profit distributions (payable to Haseotes as a shareholder) back to the corporation.  Those loans form the basis for most of Haseotes's present claim against Cumberland.  IBJ also demanded that Donald Holt -- who was an officer of both CCP and Cumberland -- resign from his post as chief financial officer at Cumberland.  Finally, IBJ insisted that under no

-5-

circumstances was Cumberland to loan any more money to either CCP or the refinery.

In order to ensure that Cumberland's loans to the refinery entities would be repaid, IBJ arranged for CCP and Cumberland to enter into a subordination agreement. In the agreement, CCP recognized its large debt to Cumberland, as well as the smaller debts owed to Haseotes and the other family members, then totaling $14,906,311. The latter debt was referred to in the agreement as "Subordinated Debt." The agreement provided generally that CCP would not allow the balance of the Subordinated Debt to drop below its current level, so that most of the company's resources could be allocated to the Cumberland loan. In the event of a default on that loan, CCP agreed to cease all payments on the Subordinated Debt, concentrating only on repaying its debt to Cumberland.

After IBJ put an end to any additional loans from Cumberland, Haseotes was forced to look elsewhere for funding for the refinery. His original estimates of the cost of bringing the refinery up to speed had proven to be well short of the mark, and by the end of the 1980s the refinery was in dire need of money. Haseotes saw an opportunity for a much-needed infusion of cash in his separate shipping operations. In 1987, Haseotes had purchased three oil tankers in the belief that they could be wedded profitably to his ownership of the refinery. He owned and operated the tankers through several companies; for the sake

of simplicity, we will refer to those companies, and the ships themselves, as Haseotes's "shipping operation." Unlike the refinery, the shipping operation quickly became profitable, and in 1990 Haseotes had the opportunity to sell it for $71 million -- roughly $50 million more than the purchase price and outstanding loan on the ships.

Haseotes's sister Lily Bentas ("Bentas"), who then was the president and CEO of Cumberland, urged him to sell the shipping operation. However, wary of the tax consequences of an outright sale, and anxious to maximize his available cash flow, Haseotes chose instead to take out a second loan on the shipping operation. In September of 1990, he obtained a $50 million loan from Chemical Bank. Haseotes personally guaranteed payment of the loan, thus linking the fate of the shipping operation to that of the refinery. If the refinery failed, Haseotes would be unable to repay the loan to Chemical Bank. And if the shipping operation defaulted on that loan, Chemical Bank could reach the refinery.

From September, 1990, until April, 1991, Haseotes loaned roughly $20 million from the shipping operation to CCP. Nevertheless, the refinery continued to struggle. CCP was unable to repay its loan to Cumberland, which was in default as of October, 1990. That failure had devastating consequences for Cumberland. By 1991, the corporation was teetering on the brink of bankruptcy.

Hoping to avert a financial crisis, Bentas and other members of the Cumberland board pressured Haseotes to sell the refinery so that CCP could repay its debt to Cumberland. Haseotes had received an offer from J. Aron & Company ("J. Aron") to purchase a 51% interest in the refinery for $70 million. At the Cumberland board meeting on July 10, 1991, the directors voted unanimously (with Haseotes abstaining) to approve and support the "concept" of the proposed sale to J. Aron. At a second meeting on August 8, 1991, Bentas expressed her "very strong interest" in having Cumberland assist in the consummation of a sale to J. Aron or any other entity "in order to stabilize economic circumstances" at Cumberland. IBJ also favored the sale. After a particularly contentious meeting between Cumberland and IBJ in the latter part of 1991, Bentas pleaded with Haseotes to accept the J. Aron offer. Haseotes told Bentas to "go to hell, it's my refinery."

Haseotes was convinced that the J. Aron offer was too low, and the sale never went through. As a result, CCP never made any payment on its debt to Cumberland. By the end of 1991, Cumberland was operating at a loss, unable to buy sufficient products to stock its convenience stores and gas stations. Finally, on May 1, 1992, Cumberland filed a petition for reorganization under chapter 11 of the Bankruptcy Act.

When Cumberland filed for bankruptcy in 1992, it had not received any payment on its loan to CCP since 1988. However, during

the period of Cumberland's financial decline, Haseotes had caused CCP to repay some of its debt to the shipping operation, and to him personally. In sum, from January 1, 1992, to May 1, 1992, CCP paid approximately $4 million to Haseotes and his wholly-owned companies. Then, during the course of Cumberland's reorganization, CCP paid another $1.75 million to Haseotes's enterprises. Those repayments -- totaling $5,753,179.05 -- are the subject of Cumberland's set-off claim.[1]

Pursuant to the reorganization plan approved by the bankruptcy court, Cumberland's creditors were divided into several different categories, including general unsecured creditors and subordinated creditors. The unsecured creditors all were repaid by early 1999. Haseotes, who had been deemed a subordinated creditor, then filed a motion to compel payment on his proof of claim. Cumberland opposed the motion, and in addition filed a cross-motion asserting its set-off claim. Haseotes lodged a detailed opposition to the cross-motion, alleging that Cumberland had failed to preserve its set-off claim because it had not filed an objection to Haseotes's claim at the time the reorganization plan was confirmed. The bankruptcy court held a hearing in July of 1999 and, in an order entered that same

---

[1] We note that Cumberland asserts set-off rights only; it does not seek to recover the difference between its claim and Haseotes's $3 million claim against the corporation. See In re Cumberland Farms, Inc., 249 B.R. 341, 343-44 (Bankr. D. Mass. 2000).

day, ruled that Cumberland's set-off rights were preserved by various provisions of the reorganization plan.  The court also ordered Cumberland to file an objection to Haseotes's claims, and set a date in January, 2000, for trial.

At approximately 8:00 p.m. on January 18, 2000 -- the night before the trial was to begin -- Haseotes filed a motion to dismiss Cumberland's set-off claim.  In that motion, Haseotes argued for the first time that Cumberland's claim was barred by the three-year statute of limitations for such claims.  The bankruptcy court heard argument on Haseotes's motion on the second day of trial.  It determined that Haseotes had forfeited the affirmative statute of limitations defense by failing to plead it in response to Cumberland's cross-motion in June

of 1999.[2] Thus, it denied the motion and allowed the trial to continue on the merits of Cumberland's set-off claim.

During the trial, the court heard testimony from various figures at Cumberland, including Holt, Haseotes, and Bentas. Following the trial and further briefing by the parties, the court concluded that Haseotes had breached his duty of loyalty to Cumberland. It reasoned that any available funds in CCP were akin to a "corporate opportunity" that Haseotes was duty-bound to offer to Cumberland before taking for himself and his own entities. The court found that Haseotes had not disclosed that opportunity to Cumberland, and that Cumberland's board had not ratified the payments from CCP to Haseotes and the shipping operation. Thus, the court allowed Cumberland's set-off claim, which

---

[2] The court also asserted two alternative grounds for disallowing Haseotes's statute of limitations defense. First, it ruled that Haseotes was equitably estopped from asserting the defense. A provision in the reorganization plan stated that Haseotes and Cumberland would enter into an agreement to toll the statute of limitations. Although the parties never in fact signed such an agreement, the court reasoned that the terms of the plan obligated Haseotes to do so. Relying on the equitable maxim that treats as done that which should have been done, see Camp v. Boyd, 229 U.S. 530, 559 (1913), the court concluded that Haseotes should be deemed to have agreed to toll the statute of limitations. See In re Cumberland Farms, 249 B.R. at 355-57. Second, the court reasoned that the statute of limitations defense was res judicata in light of its July, 1999, ruling that Cumberland had preserved its set-off rights. See id. at 358. Because we agree that Haseotes forfeited his statute of limitations defense by failing to raise it in a timely fashion, we omit any further discussion of these alternate grounds.

extinguished the corporation's debt to Haseotes.  See In re Cumberland Farms, Inc., 249 B.R. 341, 348-54, 360 (Bankr. D. Mass. 2000).

On appeal, the district court adopted the bankruptcy court's findings of fact and affirmed its decision.  Haseotes v. Cumberland Farms, Inc., 257 B.R. 691 (D. Mass. 2001).  Haseotes now appeals to this court.  Like the district court, we review the bankruptcy court's factual findings for clear error, and its conclusions of law de novo.  Smith Barney, Inc. v. Strangie (In re Strangie), 192 F.3d 192, 194 n.1 (1st Cir. 1999).

## II.

Before turning to the merits of Cumberland's breach of loyalty claim, we first must consider whether the bankruptcy court erred in denying Haseotes's statute of limitations defense.  The bankruptcy court concluded that Haseotes forfeited that defense by failing to raise it until the eve of the trial, more than six months after Cumberland first asserted its set-off claim.  Reviewing that decision for an abuse of discretion, see Keeler v. Hewitt, 697 F.2d 8, 14 (1st Cir. 1982), we affirm.

Local Rule 9013-1(j) of the Massachusetts Bankruptcy Court provides that "[i]n any opposition to a motion, the opposing party shall admit or deny each allegation of the motion, state any affirmative defense to the motion, and state specifically why the relief requested in the motion should not be granted."  That rule

-12-

parallels Rule 8(c) of the Federal Rules of Civil Procedure, which states that affirmative defenses -- including those based on a statute of limitations -- must be raised in the defendant's answer to the plaintiff's complaint. Under Rule 8(c), as under Local Rule 9013-1(j), failure to plead the statute of limitations promptly "ordinarily results in the waiver of the defense." Depositors Trust Co. v. Slobusky, 692 F.2d 205, 208 (1st Cir. 1982); accord Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1226 (1st Cir. 1994); Jakobsen v. Mass. Port Auth., 520 F.2d 810, 813 (1st Cir. 1975).

Relying on its local rule, as well as the general principle that a statute of limitations defense must be pleaded in a timely manner, the bankruptcy court reasoned that Haseotes should have raised the statute of limitations in June of 1999, when Cumberland first asserted its set-off claim. As explained, Haseotes filed a proof of claim in 1999, demanding payment on his claim against Cumberland. In addition to the usual opposition, Cumberland filed a cross-motion alleging that Haseotes had breached his duty of loyalty to the corporation, and that the $5.75 million in payments from CCP to Haseotes should be set off against Cumberland's debt to Haseotes. Haseotes filed a lengthy opposition to that cross-motion in which he argued that Cumberland had not properly preserved its set-off claim under the reorganization plan. He did not mention the statute of limitations, though roughly six years had passed since Cumberland

-13-

learned of the challenged payments from CCP to Haseotes.  Nor did he raise the statute of limitations at the hearing held in July, 1999.  Instead, he waited until January 18, 2000 -- the night before the trial was to begin on Cumberland's claim.

On appeal, Haseotes argues that the bankruptcy court abused its discretion in refusing to entertain the statute of limitations defense.  He points out that the strictures of Rule 8(c) may be relaxed "when there is no prejudice and when fairness dictates." Jakobsen, 520 F.2d at 813.  Under Rule 15 of the Federal Rules of Civil Procedure, the court "should liberally allow an amendment to the pleadings if prejudice does not result.  And if an affirmative defense is actually tried by implied consent, the pleadings may be later made to conform." Id.

Haseotes argues that the statute of limitations defense was tried with Cumberland's implied consent here because Cumberland did not object to the introduction of exhibits and testimony regarding when the corporation learned of the disputed repayments.  Indeed, Cumberland introduced some such evidence itself.  However, our cases make clear that implied consent will be found only when the opposing party "did not object to the introduction of evidence or introduced evidence himself that was relevant only to [the affirmative defense]." Lynch v. Dukakis, 719 F.2d 504, 508 (1st Cir. 1983).  Here, evidence regarding Cumberland's knowledge of the payments from CCP to Haseotes and the

-14-

shipping operation was relevant to the question whether Cumberland consented to those payments. Thus, when Cumberland's witnesses testified that they were not aware of the challenged payments until 1993, their purpose was not to pin down the date on which the statute of limitations began to run, but to show that Cumberland's board of directors did not authorize the payments. Such testimony and related exhibits therefore cannot support a finding that Cumberland impliedly consented to the trial of the statute of limitations issue.

In the absence of implied consent, amendment still may be proper if the court concludes that the opposing party will not be prejudiced by the last-minute addition of a new claim. See Fed. R. Civ. P. 15(b); Fed. R. Bankr. P. 7015. As we have explained elsewhere, rules such as Fed. R. Civ. P. 8(c) and the local bankruptcy rule are designed "to give the opposing party notice of the defense and a chance to develop evidence and offer arguments to controvert the defense." Knapp Shoes, 15 F.3d at 1226 (discussing Rule 8(c)). Under the liberal pleading regime prescribed by the Federal Rules of Civil Procedure, non-compliance with such procedural rules does not always preclude consideration of unpleaded claims or defenses. However, "[w]hile the Federal Rules reflect a universal trend away from stereotyped pleading, they do not presage abandonment of the requirements that parties be given reasonable advance notice of the major issues to be raised." Jakobsen, 520 F.2d at 815. Accordingly, courts will excuse

-15-

untimeliness only when doing so is consistent with the notice purpose of the rules. Amendment may be permitted, for example, where the opposing party already had notice of the defense through some means other than the pleadings, or would not have benefitted from advance notice in any event -- in other words, where the delay was harmless.

Haseotes argues that his failure to raise the statute of limitations defense until the eve of trial was harmless here because Cumberland would not have needed to muster any new documentary evidence or testimony to rebut the defense. Cumberland responds that Haseotes's dilatory behavior could have resulted in a different sort of prejudice. It emphasizes that the statute of limitations defense raised several potentially complex legal issues. See Jakobsen, 520 F.2d at 813-14 (finding prejudice where newly-asserted defense presented complex legal issues); accord Keeler, 697 F.2d at 14. For example, the parties had agreed that Massachusetts law governed Cumberland's allegations of a breach of fiduciary duty because there was no material difference between the law of Massachusetts (where the alleged breach occurred) and Delaware (where Cumberland is incorporated). However, the choice of law question could have proven important for the statute of limitations defense. Under Delaware law the limitations period may be suspended or ignored completely where a corporate fiduciary engaged in fraudulent self-dealing or fraudulent concealment. Massachusetts recognizes a similar principle, but apparently to a lesser extent.

Thus, Cumberland argues that it was entitled to a reasonable opportunity to develop the arguments that Delaware law applied, that Haseotes's conduct was sufficiently egregious to constitute fraudulent self-dealing or concealment, and that he should not obtain the benefit of the statute of limitations.

Although Haseotes's arguments are not without force, we cannot say that the bankruptcy court abused its discretion in concluding that Cumberland would be prejudiced unfairly by the untimely presentation of the statute of limitations defense. In light of the dispositive nature of that defense, the court reasonably could have found that Cumberland "could not, in fairness, be forced to forego the advance notice [it was] entitled to under Rule 8(c)." Jacobsen, 520 F.2d at 814. As the Seventh Circuit observed in Venters v. City of Delphi, 123 F.3d 956 (7th Cir. 1997):

> We recognize that the limitations defense may have been meritorious; and [plaintiff's] counsel should have had some inkling that the defense might be raised . . . . But it was not [plaintiff's] obligation to raise the defense, and if Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff.

Id. at 969. Without embracing a ban on all such eleventh-hour invocations of a limitations defense, we find no abuse of discretion in the bankruptcy court's refusal to forgive Haseotes's delay in raising

-17-

the statute of limitations here.  Thus, we turn to the merits of Cumberland's set-off claim.

### III.

As a member of Cumberland's board of directors, Haseotes owed the corporation a fiduciary duty of loyalty and fair dealing.  As the bankruptcy court observed, the principles governing a director's duty of loyalty are "broad and pervasive." In re Cumberland Farms, 249 B.R. at 350.  Corporate directors must "act with absolute fidelity [to the corporation] and must place their duties to the corporation above every other financial or business obligation." Demoulas v. Demoulas Super Markets, Inc., 677 N.E.2d 159, 179-80 (Mass. 1997) (internal quotation marks omitted).

The fiduciary duty is "especially exacting where the corporation is closely held." Cooke v. Lynn Sand & Stone Co., 640 N.E.2d 786, 791 (Mass. App. Ct. 1994) (citing Donahue v. Rodd Electrotype Co., 328 N.E.2d 505 (Mass. 1975)).  In a close corporation like Cumberland, "the relationship among the stockholders must be one of trust, confidence and absolute loyalty if the enterprise is to succeed. . . . All participants rely on the fidelity and abilities of those stockholders who hold office.  Disloyalty and self-seeking conduct on the part of any stockholder will engender bickering, corporate stalemates, and, perhaps, efforts to achieve dissolution." Donahue, 328 N.E.2d at 587.

-18-

In an attempt to give substance to the general duty of loyalty, courts have recognized several more specific obligations. We focus here on a particular variant known as the corporate opportunity doctrine, which prohibits a director "from taking, for personal benefit, an opportunity or advantage that belongs to the corporation." Demoulas, 677 N.E.2d at 180.

The corporate opportunity doctrine is best understood as a "rule of disclosure." Martin v. Kagan (In re Tufts Elecs., Inc.), 746 F.2d 915, 917 (1st Cir. 1984). When a corporate director learns of an opportunity that could benefit the corporation, she must inform the disinterested shareholders of all the material details of the opportunity so that they may decide whether the corporation can and should take advantage of it. Demoulas, 677 N.E.2d at 180 ("To satisfy the principle of fairness to the corporation and to meet his duty of loyalty, the fiduciary must fully disclose to the corporation, all material facts concerning the opportunity."). It is inherently unfair for the director to deny the corporation that choice and instead take the opportunity for herself. Thus, Massachusetts courts hold that "[t]he nondisclosure of a corporate opportunity is, in itself, unfair to a corporation and a breach of fiduciary duty." Id. at 183 (emphasis added).

Accordingly, it makes no difference whether, as Haseotes insists, his decision to cause CCP to repay the shipping operation

-19-

before Cumberland was "a business judgment that seemed fair at the time." Haseotes argues at length that the $5.75 million at issue was best spent paying down the loan from the shipping operation. He maintains that "the bulk of the funds" was simply funneled through the shipping operation to Chemical Bank, to repay the $50 million loan that he had personally guaranteed. A default on the Chemical Bank loan, Haseotes insists, would have had catastrophic results for the whole enterprise. Be that as it may, the decision as to how to use that money was not his to make if the availability of the $5.75 million was an "opportunity" that rightfully belonged to Cumberland. We must determine, therefore, whether the availability of money in CCP constituted an "opportunity" within the meaning of the corporate opportunity doctrine.[3]

### A. Existence of a Corporate Opportunity

Normally, a corporate opportunity is thought of as a business or investment opportunity within the sphere of, or somehow related to, the corporation's own activities. See Durfee v. Durfee & Canning, Inc., 80 N.E.2d 522, 528 (Mass. 1948) (internal quotation marks

---

[3] The bankruptcy court engaged in a wide-ranging survey of Haseotes's failings as a corporate director, going back to the beginning of the refinery enterprise in 1986. In the course of that survey, the court observed that "Haseotes should never have purchased" the refinery, and that the loans from Cumberland to CCP and the refinery were, in and of themselves, unfair to the corporation. In re Cumberland Farms, 249 B.R. at 351. We adopt a more narrow approach, focusing exclusively on the challenged repayments from CCP to Haseotes and the shipping enterprise.

-20-

omitted).  So, for example, if one of Cumberland's directors learned of a gas station for sale in the New England area, she would be obligated to disclose that fact to Cumberland before purchasing the station for herself.

Although the facts here diverge somewhat from the prototypical corporate opportunity case, we agree with the bankruptcy court that the disputed repayments fall well within the contours of the doctrine.  In Demoulas, the Supreme Judicial Court of Massachusetts ("SJC") noted that recent formulations of the corporate opportunity doctrine have "given a . . . broad definition to the scope of potential corporate interests, and have focused on the responsibility of the fiduciary to present these possibilities to the corporation for its consideration."  677 N.E.2d at 180 (citing Victor Brudney & Robert Charles Clark, A New Look at Corporate Opportunities, 94 Harv. L. Rev. 997, 1032 n.108 (1981) (stating that the definition of "corporate opportunity" should leave little room for the director to appropriate any opportunity conceivably advantageous to the corporation, without its consent)).  The court explained that, "[i]n selecting a test for determining which ventures rightfully belong to a corporation, and are subject to the corporate opportunity doctrine, the corporation deserves broad protection. . . . [T]he focus is on the paramount obligations of the fiduciary."  Id. (internal quotation marks omitted).

Here, any funds that became available in CCP provided an opportunity to pay down CCP's $50 million debt to Cumberland. That opportunity was more than "conceivably advantageous" to Cumberland; it was desperately needed. Moreover, there is no question that the money was within Cumberland's sphere of interests -- not only was it owed to Cumberland under the promissory note, but the subordination agreement explicitly required Haseotes to apply any available money toward Cumberland's loan before paying down CCP's debt to himself or other family members.[4] Yet, instead of attempting to repay Cumberland's loan, Haseotes had CCP pay more than $5 million on the loan from his own shipping operation, which in turn was financed by the loan from Chemical Bank. In so doing, Haseotes took for himself an opportunity that properly belonged to Cumberland, in violation of his duty of loyalty.

Haseotes contends that Cumberland would have chosen (as he did) to use the money to repay Chemical Bank or other creditors of the refinery, in order to preserve the chance of selling the refinery. That argument amounts to little more than a claim that Cumberland would not have been able to take advantage of the corporate opportunity, making disclosure an empty gesture. However, the Massachusetts courts consistently have held that "the existence of any impediment [to the

---

[4] Haseotes concedes that the challenged repayments violated the subordination agreement.

-22-

corporation making use of the opportunity] does not excuse the failure of a fiduciary to present the opportunity to the board and to disclose all material details before pursuing it himself." Demoulas, 677 N.E.2d at 183; accord Durfee, 80 N.E.2d at 530 ("[T]he argument that a fiduciary is not subject to the general rule [regarding corporate opportunities] where the corporation itself is unable to take advantage of [the opportunity] is not persuasive."). To the contrary, the duty of loyalty requires that "opportunities must be presented to the corporation without regard to possible impediments, and material facts must be fully disclosed, so that the corporation may consider whether and how to address these obstacles." Demoulas, 677 N.E.2d at 181.

Nor does the fact that Haseotes may not have profited personally from the disputed repayments alter our analysis. The key point is that he "placed himself in a position in which . . . his own pecuniary interests could have prevented him from acting in [Cumberland's] best interest." Geller v. Allied-Lyons PLC, 674 N.E.2d 1334, 1337 (Mass. App. Ct. 1997) (emphasis added). In such circumstances, Haseotes was obligated to seek approval from Cumberland's board before acting. The requirement of disclosure "takes from the fiduciary the power to decide whether the opportunity or self-dealing transaction is in the corporation's interest and removes the temptation posed by a 'conflict between self-interest and integrity.'" Demoulas, 677 N.E.2d at 181 (quoting Durfee, 80 N.E.2d at 528).

-23-

B.  Disclosure

We turn, then, to the question whether Haseotes disclosed the opportunity to Cumberland.  As a matter of law, any disclosure must be "full."  Dynan v. Fritz, 508 N.E.2d 1371, 1378 (Mass. 1987) ("[G]ood faith requires full and honest disclosure of all relevant circumstances to permit a disinterested decisionmaker to exercise its informed judgment.").  A director plainly violates his duty of loyalty if his disclosure of the corporate opportunity is "misleading, inaccurate, and materially incomplete."  Demoulas, 677 N.E.2d at 185 (internal quotation marks omitted).  Similarly, "sotto voce indications do not fulfil a fiduciary's duty of full disclosure." Geller, 674 N.E.2d at 1338 (citing cases); see also id. at 1339 & n.9 (rejecting inference that disinterested director's lack of response to alleged disclosure constituted acquiescence).

Haseotes does not attempt to show that he made the kind of full and explicit disclosure required by Massachusetts law.  Instead, he argues that disclosure was unnecessary because the other members of Cumberland's board knew that money was available in CCP, and that Haseotes was using it to repay the loan from his shipping operation. It is not clear whether such an argument is a viable defense to liability under the corporate opportunity doctrine.  As noted above, Massachusetts courts hold that the failure to disclose a corporate opportunity is, in and of itself, a breach of the duty of loyalty.

Demoulas, 677 N.E.2d at 183.  We need not resolve that question here, however, because the bankruptcy court found that Cumberland's directors were not aware of the opportunity for repayment.  We reverse the bankruptcy court's findings of fact only if, on the entire evidence, we are "'left with the definite and firm conviction that a mistake has been committed.'"  In re GSF Corp., 938 F.2d 1467, 1474 (1st Cir. 1991) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (describing standard for clear error)).  We find no such clear error here.

Based on the evidence presented at trial, the bankruptcy court determined that Bentas and the other members of Cumberland's board were not aware of the 1992 and 1993 payments from CCP to Haseotes and the shipping operation.  Moreover, the court concluded that Haseotes knew that such payments would be viewed with disapproval by Cumberland's other directors.  Not only did they violate the 1988 subordination agreement, but memos from Bentas to Haseotes -- first in 1990, and again in 1992 -- made clear that she opposed any payments from CCP to the shipping operation or Haseotes's other enterprises.

Not surprisingly, Haseotes takes a different view of the facts.  To support his claim that Bentas and the other members of Cumberland's board of directors must have known of the payments from CCP to the shipping operation, Haseotes points to testimony by Donna Walsh, Cumberland's assistant treasurer, that she sent quarterly

reports to Bentas listing the balances of various shareholder accounts. One of the columns on those reports was devoted to CCP's debt to Haseotes. By comparing the balance on that account from one report to the next, Bentas could have discovered that Haseotes was causing CCP to pay down its debt to him.[5]

However, Walsh testified that the quarterly reports were not always issued promptly. In particular, it appears that the reports for September and December, 1992, were not issued until July, 1993. Moreover, Bentas herself testified that she did not compare the quarterly reports, and was not aware of the payments from CCP to the shipping operations at the time they were made. Arthur Koumantzelis, Cumberland's chief financial officer during the relevant period and another recipient of the quarterly reports, also denied any knowledge of the challenged payments. The bankruptcy court did not commit clear error in crediting that testimony, and in concluding that Cumberland's directors were not aware of the payments made by CCP in 1992 and 1993.

---

[5] Haseotes also emphasizes that the disputed repayments were completed by Cumberland employees, who, following instructions from Haseotes, wired money from CCP to the shipping operations. Haseotes elicited testimony from Walsh that she sometimes sought authorization for wire transfers from Bentas. However, Walsh could not remember the specifics of the transfers Bentas approved, and the bankruptcy court concluded that Holt (who had assumed the title of Senior Vice President at Cumberland after stepping down from his post as chief financial officer) authorized the disputed transactions.

Haseotes also argues that Cumberland's directors should have known that money was available in CCP and that Haseotes was using it to repay the loan from the shipping operation.  Emphasizing that the quarterly reports were available for scrutiny, and that he never attempted to hide his actions, he "implies that Cumberland was negligent in not acquiring all the information pertaining to [the repayments]."  In re Cumberland Farms, 249 B.R. at 354.

That argument turns the duty of disclosure on its head. "While it is true that officers and directors have a duty of reasonable supervision, this duty is for the benefit of the corporation, not the wrongdoer." Puritan Med. Ctr. v. Cashman, 596 N.E.2d 1004, 1008 (Mass. 1992)(citation omitted).[6] Thus, it is not enough that, through their own investigations, the members of Cumberland's board might have learned -- or at least suspected -- that money was available in CCP:

---

[6] Haseotes makes much of the fact that the SJC acknowledged in Puritan that ratification sometimes is inferred from silence in cases involving "third-party, arm's-length transactions from which the corporation received a benefit, and directors who, at minimum, had knowledge of such facts or circumstances as would put a reasonable person on inquiry and which would lead to full discovery."  596 N.E.2d at 1008 (internal quotation marks omitted).  However, the court explicitly distinguished those cases from the facts in Puritan, making clear that the corporation's failure to supervise its affairs in such a manner as to discover the breach of loyalty did not amount to ratification.  As Cumberland explains, the implied-ratification cases discussed in Puritan did not involve corporate fiduciaries.  E.g., Inn Foods, Inc. v. Equitable Co-Operative Bank, 45 F.3d 594, 597 n.6 (1st Cir. 1995) (recognizing that distinction).  Accordingly, Haseotes's reliance on those cases is misplaced.

> The mere existence of a suspicion that there has been a breach of trust is not sufficient to constitute a confirmation. For a cestui que trust to 'ratify' or confirm a breach of trust, he must be apprised of all the material facts and as well of their legal effect. No half-hearted disclosure or partial discovery is sufficient in either respect. The trustee's duty of disclosure is not discharged by leaving the cestui to draw doubtful inferences, conclusions and suspicions.

Durfee, 80 N.E.2d at 531 (internal quotation marks omitted).

In sum, we conclude that the bankruptcy court did not err in finding that Haseotes breached his duty of loyalty to Cumberland when, without informing Cumberland's board of directors that money had become available in CCP, he caused CCP to apply the money toward its debt to Haseotes's shipping operation, rather than its larger debt to Cumberland. The judgment of the district court is affirmed.

**So ordered**.